### SYKES v. HOLLOWAY et al.

#### (Circuit Court, D. Kentucky. May 8, 1897.)

1. NATIONAL BANKS—LIABILITY OF STOCKHOLDERS—FRAUDULENT TRANSFER OF STOCK.

The burden is on the receiver of a national bank to show that a transfer of stock was made by the transferror for the fraudulent purpose of avoiding liability as a stockholder; and evidence showing that the husband of the transferror had knowledge of the embarrassed condition of the bank before the transfer was made, and that she had admitted that she never transacted any business without the advice of her husband, is not sufficient for that purpose, as against the positive statement of the transferror that no one ever suggested to her to transfer the stock for the purpose of relieving herself from liability, or suggested to her that the bank was in a failing condition, and that she made the transfer to her daughter as an advancement.

2. SAME—GIFT OF STOCK TO IRRESPONSIBLE PERSON.

Under Rev. St. U. S. § 5151, making shareholders in a national bank liable for the debts of the association, and section 5139, providing for the transfer of shares, with a provision that the transferee shall "succeed to all the rights and liabilities of the prior stockholders of such shares; and no change shall be made in the articles of the association by which the rights, remedies, and securities of the existing creditors of the association shall be impaired,"—a transfer of stock, though without consideration and to an irresponsible person, cannot be set aside by the receiver if made in good faith without knowledge of the failing condition of the bank.

Saunders & Thomas, for complainant.
Garvin Bell, for defendants.

BARR, District Judge.    This is a suit brought by the receiver of the First National Bank of Starkville to set aside and cancel the transfer of 30 shares of stock in said bank which were owned by Annie W. Holloway, the wife of James M. Holloway, and transferred by her to her daughter Lettie Holloway on the 18th of May, 1893; the bank having suspended on the 14th of the following July, and the complainant appointed receiver in August, 1893.    The facts are briefly these: The defendant Annie W. Holloway purchased in October, 1889, at a premium, 30 shares of stock in the First National Bank of Starkville.    At that time E. L. Tarry was cashier of said bank,

and continued cashier for some time. Subsequently he became vice president, and was at the time of the purchase of the stock, and continuously until the time of the failure of the bank, the chief executive officer of said bank, and was the son-in-law of the defendant Annie W. Holloway and James M. Holloway, and the brother-in-law of the defendant Lettie Holloway. This bank had originally a capital of $50,-000, which was afterwards (about 1889) increased to $60,000. The defendant Annie W. Holloway and James M. Holloway went on a visit to Mr. Tarry and wife at Starkville in February, and remained with them about six weeks in the months of February and March, 1893. Mrs. Holloway took with her her certificate of stock in said bank, with the intention of disposing of it. She did not, however, so far as the evidence goes, either dispose of it or attempt to dispose of it, and the reason given by her was that Dr. Holloway was too unwell while there to advise her in regard to the matter. It appears from the testimony that this bank was in fact in an embarrassed condition at that time, and gradually losing the confidence of the local public, and that there was no market for the stock, but it does not affirmatively appear that Mrs. Holloway or Dr. Holloway had any information of this fact. Dr. Holloway himself is shown to have been confined to the house all the time while in Starkville, having gone there for the purpose of rest, and was much of the time confined to his bed. The bank becoming very much in need of money, about the last of April or the 1st of May, 1893, Mr. Tarry, the vice president, came to Louisville for the purpose of making some arrangement with Theodore Harris, the president of the Louisville Banking Company, by which he could get accommodation to tide over the embarrassment. He met Dr. Holloway when he came to Louisville, and explained to him the needs of the bank, and the fact that the bank would be compelled to suspend unless he could make some arrangement for accommodation with the Louisville Banking Company. After this conversation with Dr. Holloway, he saw Theodore Harris, the president of the Louisville Banking Company, and, upon terms not clearly shown, he obtained from him a promise to accommodate him and carry him through his troubles. The fact that Harris had made the promise was communicated to Dr. Holloway, who, according to the statement of the witness, was much relieved thereby. After Tarry's return home, Mrs. Holloway's stock was transferred to her daughter Miss Lettie Holloway. The particulars of this transfer are not shown in the record, but presumably this certificate was sent from Louisville with instructions to make the transfer, which was done. The allegations of the bill are that the transfer was made on the 8th of May. The record, however, shows that the actual transfer was made on the 18th of May, 1893. The bank continued its business until the 14th of July, 1893, when it suspended, and shortly after it was taken possession of by a receiver appointed to wind it up. Afterwards there was an assessment made by the comptroller of 70 per cent. on all of the stockholders; and the purpose of the bill is to cancel this transfer of Mrs. Holloway to her daughter, and recover from her the assessment of $70 per share on the stock. Miss Lettie Holloway was at the time about 23 years of age, living

81 F.—28

with her father and mother, and was a young lady without any pecuniary responsibility. Mrs. Holloway, besides this stock, had other property,—how much is not definitely shown in the record,—and had other children, to whom she had given property, after their marriages, in sums more than the par of this stock.

The defendants, by joint answer, have made an issue upon the question of whether or not the First National Bank of Starkville was insolvent at the time of the transfer, and whether or not it was insolvent at the time of the suspension, in July, 1893. They have also made an issue as to whether or not Mrs. Holloway had knowledge of the insolvency of the bank at the time of the transfer, or such information as would lead her to inquire and know the real condition of the bank. The evidence upon the question of the insolvency of this bank is very voluminous, but we conclude that the bank was in fact insolvent at the time of the transfer of the stock, in May, 1893, as well as in July, 1893, when it suspended, and had been for six months prior thereto, and that the debts which it owed in July, 1893, were substantially the same debts as existed on the 18th of May, 1893. On the subject of Mrs. Holloway's knowledge or information on the condition of the bank in May, 1893, beyond her own statement the evidence is very meager. She has given her deposition, on which there were no cross interrogatories, and in the fourth interrogatory this question is asked her:

"Did you know or believe at the time you made the transfer of the thirty shares of stock in the First National Bank of Starkville, Miss., to your daughter Lettie, in May, 1893,—being the transfer referred to in the complainant's bill,—that said bank was insolvent, or in a failing condition? Answer. I did not know at the time the transfer was made of the 30 shares of stock, in May, 1893, that said bank was either insolvent or in a failing condition."

And in answer to interrogatory 5, which is:

"Had anybody ever told or suggested to you, before said transfer, that said bank was insolvent or in a failing condition, or had any one, before said transfer, suggested to you that you should transfer the stock to escape liability as a stockholder? Answer. I never had a word with any one on the subject. Nobody told me the bank was insolvent or in a failing condition, or suggested it, and nobody suggested that I should transfer the stock to escape liability as a stockholder."

Neither the depositions of Dr. Holloway nor of his daughter Lettie (now Mrs. Higgins) have been taken. Mrs. Holloway in this deposition stated, as did the other defendants in their answer, that this transfer was made to her daughter as an advancement, as her daughter was then engaged to be married, and that the advancements made to her other children were more than the par of this stock. It, however, appears that the advancements made to the other children were made after their marriages, and it also appears that Miss Lettie Holloway did not marry until October, 1895.

Thus, we have the positive denial of Mrs. Holloway, under oath, on the one side, with the facts shown that Dr. Holloway, her husband, had knowledge of the embarrassed condition of the bank a few days before the transfer of this stock, and the further evidence that she said to E. L. Tarry that she "never done anything [in regard to business] without the advice of her husband." But this evidence

is not sufficient to overcome the positive statement of Mrs. Holloway that no one ever suggested to her to transfer the stock for the purpose of relieving herself from liability, and that no one suggested to her that the bank was insolvent or in a failing condition, and the further statement of the answer, and her own statement in her deposition, that this transfer was made as an advancement to her daughter. The complainant is seeking to have this transfer canceled upon the ground that the transfer was fraudulent, and the burden of showing that fact is upon him. If this transfer is fraudulent, it must rest upon the other facts, which are not controverted, besides being clearly shown, that Miss Holloway was at the time a young lady living at the home of her father and mother, entirely dependent upon them, without any means whatever, and without, as far as the record shows, any immediate prospect of means; having this stock transferred to her as a gift, and hence without valuable consideration. It is argued that this stock was an advancement, and as such would have been chargeable to Miss Holloway, as between her and her brothers and sisters, in the event of the death of her mother. Whether or not it would have been an advancement depended entirely upon the will of Mrs. Holloway, as it would only have been charged to Miss Lettie Holloway as an advancement, as to property undisposed of by her mother, in the event she died intestate, or, if testate, as to the property undisposed of, and then only at its value as of the time of the transfer. Ky. St. § 1407. We must therefore assume that the transfer of this stock was a gift, and not for a valuable consideration. The inquiry is whether or not, under the statute, Mrs. Holloway's transfer should be declared invalid. Her liability, if any, must depend upon the statute. The national banking act provides that:

"Shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares." Rev. St. U. S. § 5151.

And section 5139 provides:

"That the capital stock of each association shall be divided into shares of $100 each, and be deemed personal property, and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association. Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares; and no change shall be made in the articles of the association by which the rights, remedies, or security of the existing creditors of the association shall be impaired."

These sections were originally a part of the same enactment, and should be construed together. We must presume from the evidence in this record that this transfer was made, not for a valuable, but for a good, consideration, only, and that it was in fact an out and out transfer, made without knowledge or notice of the embarrassed condition of the bank; yet it was made by a mother, who could respond to her liability as a stockholder, to a daughter, who could not then respond in any degree to that liability. It therefore, to that extent, impaired the security of the existing creditors of the bank; and the

inquiry is whether that fact, which was known to Mrs. Holloway, is sufficient to cause the setting aside and cancellation of said transfer. It will be observed that the language of section 5139 is not that no transfer shall be made by which the rights, remedies, and securities of the existing creditors of the association shall be impaired, but that no change shall be made in the articles of the association, etc., which must have reference to the by-laws under which the transfers were permitted to be 'made. We therefore must look at the decisions under this act, and see whether or not they require a valuable consideration for a transfer, and that the transferee, under such circumstances, shall be as solvent as the transferror. I find in the decisions some broad expressions which would seem to sustain the contention of the complainant, but I have been unable to find any case in which the question of the pecuniary condition of the transferee is a material element on the question of sustaining the transfer. It is a most material matter where the inquiry is whether or not the transfer is a bona fide, out and out transfer, or a mere sham; but, as far as we have examined the cases, none of them go to the effect that if the transfer, though without a valuable consideration, was bona fide, and the transferror had no knowledge of the embarrassed condition of the bank, and no information which would have given him or her such notice, such transfer is invalid or fraudulent. Thus, it is said by the supreme court in the case of Bank v. Case, 99 U. S. 631:

"While it is true that shareholders of the stock of a corporation generally have a right to transfer their shares, and thus disconnect themselves from the corporation, and from any responsibility on account of it, it is equally true that there are some limits to this right. A transfer for the mere purpose of avoiding his liability to the company or its creditors is fraudulent and void, and he remains still liable. The English cases, it is admitted, give effect to such transfers, if they are made, as it is called, 'out and out'; that is completely, so as to devest the transferror of all interest in the stock. But even in them it is held that if the transfer is merely colorable, or, as sometimes coarsely denominated, a sham,—if in fact the transferee is a mere tool or nominee of the transferror, so that, as between themselves, there has been no real transfer, 'but in the event of the company becoming prosperous the transferror would become interested in the profits,—the transfer will be held for naught, and the transferror will be put upon the list of contributories.' Williams' Case, L. R. 9 Eq. 225, note, where the transfer was, as in the present case, made to a clerk of the transferror, without consideration; Payne's Case, Id. 223; Kintrea's Case, 5 Ch. App. 95. See, also, Lindl. Partn. (2d Ed.) p. 1352; Chinnock's Case, 1 Johns. Eng. Ch. 714; Hyam's Case, 1 De Gex, F. & J. 75; Budd's Case, 3 De Gex, F. & J. 296. The American doctrine is even more stringent. Mr. Thompson states it thus (and he is supported by the adjudicated cases): 'A transfer of shares in a failing corporation, made by the transferror, with the purpose of escaping his liability as a shareholder, to a person who from any cause is incapable of responding in respect to such liability, is void as to the creditors of the company and as to other shareholders, although, as between the transferror and transferee, it was out and out.' Nathan v. Whitlock, 9 Paige, 152; McClaren v. Franciscus, 43 Mo. 452; Marcy v. Clark, 17 Mass. 329; Johnson v. Laflin (by Dillon, J.) 6 Cent. Law J. 131, Fed. Cas. No. 7,393."

In that case, however, the question was simply whether or not the holder of collateral security, who had the stock transferred to it, and subsequently to a clerk in its bank, without consideration, was liable under the national banking act; and it was held that, the transfer

having been made to the bank, the subsequent transfer to the clerk was colorable merely. This statement of the supreme court, as quoted, is as strong a statement as I have seen; but it will be observed that it is a material element that the transfer was made in a failing corporation for the purpose of escaping his liability as a shareholder, and that the purpose is coupled with the want of capacity of the transferee to respond to his liability. So in Bowden v. Johnson, 107 U. S. 261, 2 Sup. Ct. 254, the court say:

"But it was held by this court in Bank v. Case, 99 U. S. 628, that a transfer on the books of the bank is not in all cases enough to extinguish liability. The court in that case defined as one limit of the right to transfer that the transfer must be out and out, or one really transferring the ownership, as between the parties to it. But there is nothing in the statute excluding, as another limit, that the transfer must not be to a person known to be irresponsible, and collusively made with the intent of escaping liability and defeating the rights given by statute to creditors. Mrs. Valentine might be liable as a shareholder succeeding to the liabilities of Johnson, because she has voluntarily assumed that position; but that is no reason why Johnson should not, at the election of the creditors, still be treated as a shareholder,—he having, to escape liability, perpetrated a fraud on the statute."

In that case the court held that Johnson had knowledge of the failing condition of the company, and that Mrs. Valentine, who lived in his house, had not paid a consideration for the alleged transfer, and that she was without means to respond to her liability, and hence that it was not a bona fide transaction, but made by Johnson with a view to escape his liability as a shareholder. It will be observed in this case, as in the other, that the knowledge or notice by the transferror of the failing condition of the bank was considered as a material element in making out the fraud.

In the case of Foster v. Lincoln, reported in 74 Fed. 382, which is referred to by counsel for the complainant as decisive of this case, Lincoln was president of a national bank at Lyndon, Vt., and held 25 shares of stock in the First National Bank of Deming, N. M., and the bank of which he was president also held 50 shares in the same bank. On September 15, 1891, a telegram came to the Lyndon Bank urgently calling for $5,000 to be sent by telegraph in aid of the Deming Bank of New Mexico. This came to the knowledge of Mr. Lincoln, president of the First National Bank of Lyndon, and was considered by him and others. On September 21st he transferred his stock in the Deming Bank, in equal parts, to his five children, one of whom was married, two of whom were minors, and all of whom were irresponsible for assessments on it. He testified that he contemplated giving them property, for which they began to ask, and he said to them, "I have $5,000 in New Mexico bank stock. I will give you $1,000 each;" and the transfer was made without other consideration. The New Mexico bank, according to the testimony of the cashier, had never been solvent, and was badly insolvent, with liabilities of about $150,000 to depositors and other banks at that time, and on February 3, 1892, failed. The suit was brought by the receiver to recover an assessment of 82 per cent. against Lincoln. Wheeler, District Judge, says:

"The defendant, Benjamin F. Lincoln, appears to have been under liability to the creditors of the bank when this transfer was made. These statutes

seem to intend that this liability should not be impaired by transfer, and especially should it not be by a transfer merely voluntary. As a bank man, he must have known of this liability, and he had warning of the straits of the bank by the telegram six days before the transfer. In these circumstances, he must have made the transfer in contemplation of this liability, although he did not know what it would amount to, and hoped, and perhaps expected, it would not amount to anything. Had the transfer been made on adequate consideration for such shares, in a solvent bank, to a purchaser without the warning he had, the sale would probably be voidable, at the instance of the purchaser, for the deceit. The transfer should be so now, at the instance of the creditors represented by the receiver. Bowden v. Johnson, 107 U. S. 251, 2 Sup. Ct. 246."

It will be observed in this case that the fact of his knowledge of the condition of the bank, and the warning of the straits in which it was by the telegram immediately before the transfer, is made a material element in making out the liability.

In the recent case of Stuart v. Hayden, 18 C. C. A. 621, 72 Fed. 406, referred to by counsel, and decided by the court of appeals of the Eighth circuit in considering the question of the liability of a stockholder who had transferred his stock in a national bank, the court say:

"In order to determine whether or not this receiver was entitled to enforce this liability, the court below was required to answer two questions, and two questions only. They were: (1) Did Stuart make this transfer of his stock to Gruetter & Joers on December 22, 1892, with knowledge, or with such notice as would, if pursued with reasonable diligence, have given him knowledge, that the bank was insolvent, or its failure impending, and for the purpose of escaping his individual liability on the stock? And (2) did the transfer cause any damage to the creditors of the bank?"

It sustained the lower court in finding affirmatively on both of these inquiries, and held the transferror liable for the assessment. The damage which was caused to the creditors of the bank was the insolvency of the transferee; but it will be seen that the knowledge or notice of the transferror was held an indispensable element in making out the liability. It seems to us that upon principle the pecuniary condition of the transferee of stock in a national bank at the time of the transfer, while material upon the inquiry of whether or not the transfer is bona fide or colorable, cannot be a decisive element on the question of liability of the transferror, where the transfer has been made out and out without knowledge or notice of the failing condition of the bank. Such a test of liability of a transferror of stock would materially destroy the transferability of such stock, and would be an impracticable test to apply; and even though it be conceded, as in this case, that the consideration for the transfer was a good, but not a valuable, one, that fact should not be sufficient to set aside and make fraudulent the transfer. It seems to us clear that the ownership of this stock passed from the defendant Annie W. Holloway to her daughter Lettie Holloway, as between them, as perfectly as if a full, valuable consideration had been given. Our attention has been called to the recent case of Pauly v. Trust Co., which has been published, since the submission of this cause, in 165 U. S. 606, 17 Sup. Ct. 465, in which the supreme court has held, where a party has stock in a national bank, and transfers it as collateral security to another, who had the transfer made in express terms as

pledgee, that in fact the relations which existed between the original stockholder and the holder of the collateral security were simply those of borrower and lender of money, and, as this relationship was shown upon the certificate of stock and upon the books of the national bank, the pledgee was not liable for an assessment against the stock made by the comptroller. The court indicated in this opinion that the original holder (the borrower of the money), being the true owner, would be liable to the assessment, and in the opinion explained somewhat the broad language used in the case of Bank v. Case, 99 U. S. 628. We see nothing in this opinion which militates against the view we have taken, but it rather sustains it. We therefore conclude that the complainant's bill must be dismissed, with costs, and it is so ordered.