# APRIL TERM, 1899.*

FOSTER *v.* ROW.[1]

120   1
s123  352

1. BANKS—INSOLVENCY—EX PARTE ORDERS.

The circuit court has jurisdiction, upon a showing by the receiver of an insolvent bank that its assets are insufficient to pay depositors, to ascertain *ex parte* the amount required to meet the deficit, and to direct the institution of proceedings to enforce the statutory liability of the stockholders.

2. SAME—LIABILITY OF STOCKHOLDERS TO DEPOSITORS—EXHAUSTION OF ASSETS.

The liability imposed by 3 How. Stat. § 3208e5, upon the stockholders of an insolvent bank for the benefit of its depositors, is not a mere collateral undertaking, or penal in its nature, but is contractual, and immediately enforceable when a deficiency in the other assets is ascertained, without such assets' being first exhausted.

3. SAME—CONSTITUTIONAL LAW—BANKS OF ISSUE.

Article 15, § 3, of the Constitution, which makes the stockholders of every banking association "issuing bank notes" individually liable for "all debts" of the association to the amount of their respective shares, is not contravened by 3 How. Stat. § 3208e5, limiting the liability of stockholders in banks organized under the state banking law to debts due depositors, since that law applies only to banks not of issue.

4. SAME—WHAT STOCKHOLDERS LIABLE.

The stockholders who are liable are those who are such when the bank becomes insolvent, without reference to the time when the deposits were actually made.

5. SAME—DEFENSES—FRAUDULENT REPRESENTATIONS.

One who purchases bank stock six months before the bank becomes insolvent, and during such period appears as the registered holder of the stock, cannot avoid responsibility in an action by the receiver to enforce the statutory liability of

---

* Continued from Vol. 119.

[1] Rehearing (defendant Chatterton's application) denied June 28, 1899.

stockholders, upon the ground that he was induced to pur-
chase the stock through false representations of the bank's
officers as to its value.

6. SAME—TRANSFER ON BOOKS—DEPOSIT AS COLLATERAL.
   A purchaser of bank stock deposited it as collateral with the
   bank for a loan, with which the stock was purchased; but,
   on repayment of the loan, the bank having suspended, he re-
   fused to take the stock. *Held*, that he was the owner of it,
   and individually liable, notwithstanding the stock had never
   been transferred to him on the books of the bank.

7. SAME—SALE TO CASHIER.
   A stockholder in a bank ceases to be liable as such where he
   sells and delivers his stock, duly assigned, to the cashier of
   the bank, who directs a credit to be entered on the trans-
   ferrer's pass-book for the amount of an overdraft equaling
   the agreed price, although the cashier never pays the bank or
   registers the stock to himself.

8. SAME—INSOLVENT CONDITION—KNOWLEDGE OF TRANSFERRER.
   The fact that a bank was in a failing condition when stock
   was transferred will not avoid the transfer as an attempt on
   the part of the transferrer to escape the statutory liability to
   depositors, where there is nothing to show that he knew of
   the condition of the bank.

9. SAME—FRAUDULENT TRANSFER—BURDEN OF PROOF.
   The burden is on the receiver of an insolvent bank to show
   that a transfer of stock, made when the bank was in a failing
   condition, was effected by the transferrer with the fraudu-
   lent purpose of avoiding liability as stockholder.

10. SAME—NONRESIDENT TRANSFEREE.
    That the person to whom stock in a failing bank was trans-
    ferred was a nonresident has no bearing on the good faith of
    the transfer, nonresident stockholders being, equally with
    residents, amenable to the banking law.

11. SAME—REGISTERED HOLDER—RIGHTS AND LIABILITIES.
    The fact that shares of bank stock are issued transferable on
    the books of the bank does not impair the right of the holder
    to pass title to a transferee by assignment and delivery, but it
    operates merely as a protection to the bank and its patrons
    by continuing ordinarily the status of the transferrer until
    the transfer is duly registered.

12. SAME—GIFT—RESPONSIBILITY OF DONEE.
    Where a responsible stockholder in a failing bank presents
    his stock to his son, who is not responsible, before the bank

passes into the hands of a receiver, and the transfer is duly registered, the donor is relieved from statutory liability as stockholder, unless it appears that he was aware that the bank was insolvent.

Appeal from Ingham; Person, J.   Submitted October 21, 1898.   Decided April 18, 1899.

Bill by Seymour Foster, receiver of the People's Savings Bank of Lansing, against Samuel H. Row, Elgin Mifflin, James P. Edmonds, Mason D. Chatterton, Jacob Stahl, William A. Fraser, and others, to enforce the statutory liability of the stockholders in said bank to the depositors. From a decree for complainant, the above-named defendants appeal. Affirmed as to defendants Chatterton, Fraser, and Mifflin; reversed as to defendants Edmonds, Stahl, and Row.

*Russell C. Ostrander*, for complainant.

*Samuel H. Row, M. D. Chatterton*, and *William A. Fraser, in pro. per.*

*Bartlett Wiley*, for defendants Mifflin and Edmonds.

*E. C. Chapin*, for defendant Stahl, and of counsel for defendant Row.

LONG, J.   Complainant is receiver of the People's Savings Bank.   The defendants, it is claimed, are stockholders in that bank.   This suit, by bill in equity, is brought to enforce the statutory liability of stockholders for the benefit of the depositors of the bank.   The suit was commenced against all the resident stockholders, and a decree entered against them in the court below.   Only the six defendants here have appealed, and each relies upon some special defense not common to the whole body of stockholders.   There are some questions raised, however, which go to the jurisdiction, and in which all the defendants have a common interest.

It appears that the bank was organized June 29, 1885,

with a capital stock of $25,000, and was permitted by its articles of incorporation to do a savings business only. On July 5, 1889, amended articles were filed, adding a new clause, stating the bank to be both a commercial and a savings bank. On January 23, 1892, the stockholders voted to increase the capital stock to $150,000. The bank failed and ceased to do business on July 11, 1896. The reasons for such failure need not be set up here. The receiver took possession on July 15, 1896. He found on hand in the bank in cash $2,915.95. There was a balance at the Chase National Bank, New York, of $1,343.82. Excepting these two items, the bank had no cash. The total assets of the bank up to the time of the hearing of this case in the court below were $394,050.65, as shown by the books of the bank, of which the receiver estimates (and his estimate is not disputed) $184,536.45 worthless and $88,305.04 doubtful, leaving $121,209.16 of good assets, which is about the amount of collateral pledged by the bank to secure the persons from whom it had borrowed money. He found the total liabilities of the bank, as shown from the books, exclusive of capital stock, to be $249,140.63, showing a deficit over liabilities and capital stock, after taking out all the good and one-half of the doubtful assets, of over $230,000. The claim of the receiver is that, having ascertained to his satisfaction that after exhausting all the assets of the bank the depositors would not be fully paid, and having also ascertained the amount of the deficiency, it was his duty to apply to the court by petition for an order judicially determining the necessity to proceed against the stockholders, that the amount might be ascertained and an order obtained to enforce the liability. This proceeding was *ex parte*. The petition was filed, testimony taken, and the court found that it would require an assessment of 70 per cent. upon the stockholders to pay depositors and expenses of receivership. The receiver was thereupon directed to proceed by bill in chancery to enforce the liability.

The theory of the receiver is that the bank was insol-

vent, and unable to pay its depositors in cash as their de-
mands might be made upon it; that the liability of the
stockholders of the bank to pay depositors is a contrac-
tual, and not a penal, liability or obligation; that this
statutory liability creates and places at the disposal of the
receiver an asset equal in amount to the capital stock,
which he can use, when necessary, to pay depositors; that
the bank had depositors whose claims were due at any
time upon presentation, and due, as matter of law, when
the bank shut its doors; that the duty of the stockholders
to furnish funds with which to pay depositors was imme-
diate, and the liability under the statute was one to be
immediately enforced by the receiver; that the receiver in
this proceeding represents in no sense the bank as a cor-
poration, but represents the depositors only; that, the
necessity for the assessment being apparent, and the
amount of the assessment being ascertained with reason-
able certainty, and that assessment being less than the
par value of the stock, the proceeding to enforce the lia-
bility should be in equity, and might be against all the
stockholders, although the obligation on the part of the
stockholders is a several, and not a joint, one. On the
other hand, it is claimed by some of the stockholders that
the liability is a collateral one, and can be enforced only
after it has been ascertained that the assets of the bank
are insufficient to pay depositors; that this requires that
the receiver shall absolutely exhaust the assets of the
bank before applying to the stockholders for contribution;
that the necessity for an assessment could not be determined
by the court *ex parte*, but should have been upon notice
and hearing; and that the order made for the assessment,
and for this suit to enforce the assessment, was without
jurisdiction, and not binding upon any of the stock-
holders.

Whether the court could proceed *ex parte* to make the
order in this case is not now important. The petition
made by the receiver gave the court jurisdiction to deter-
mine, at least, the necessity for the commencement of

the proceeding against the stockholders to collect some amount, as it was made apparent that there was a deficiency. On the hearing on the bill in the present case, the receiver, without waiving reliance upon the *ex parte* order determining the amount of the deficiency and declaring the necessity for the bringing of the suit, established by testimony the condition of the bank and the necessity for an assessment of at least 70 per cent., being the amount theretofore fixed by the court in the *ex parte* order. There was no testimony offered on the part of the stockholders to show that the bank was solvent, or that the receiver's estimates were not correct; and, in fact, there was no testimony offered by the stockholders showing that the condition of the bank was not as claimed by him, nor did they attempt to question the value fixed by him upon the assets. Counsel for the receiver, however, cites many cases supporting the procedure for the *ex parte* order here taken, though he concedes. that a stockholder might show in the proceeding that the bank was not in fact insolvent, but had ample cash or other assets with which to pay its indebtedness; and some of the cases cited by counsel seem to hold that a stockholder might show that the facts upon which the circuit judge acted in making the *ex parte* order were untrue, or that there was collusion or fraud inducing the ordering of the assessment. But, as no such showing was made here, and the complainant did not rest upon the *ex parte* order, but introduced testimony showing the necessity and the amount, that question need not be discussed. We are satisfied that the court had jurisdiction, and that there was no error in directing the proceedings.

The liability may be enforced in law or equity. 3 How. Stat. § 3208e5, being section 46. Act No. 205, Pub. Acts 1887. This section provides:

"The stockholders of every bank shall be individually liable, equally and ratably, and not one for another, for the benefit of the depositors in said bank, to the amount of their stock at the par value thereof, in addition to the said

stock; but persons holding stock as executors, administrators, guardians, or trustees, and persons holding stock as collateral security, shall not be personally liable as stockholders, but the assets and funds in their hands constituting the trust shall be liable to the same extent as the testator, intestate, ward, or person interested in such trust funds would be, if living or competent to act; and the person pledging such stock shall be deemed the stockholder and liable under this section. Such liability may be enforced in a suit at law or in equity by any such bank in process of liquidation, or by any receiver or other officer succeeding to the legal rights of said bank."

Section 55 of the act (3 How. Stat. § 3208*f*4) reads:

"On becoming satisfied that any bank has refused to pay its deposits, * * * the commissioner of the banking department may forthwith * * * apply to a court of record * * * for the appointment of a receiver for such bank, who, under the direction of such court, shall take possession of the books, * * * and may, if necessary to pay the debts of such bank, enforce all individual liability of the stockholders."

The national banking law contains a similar provision, the only difference being that the liability is imposed for the benefit of all the creditors of the bank, instead of for depositors only. Section 5151, Rev. Stat. U. S. Under this United States statute, it is held that, when the comptroller of the currency orders an assessment upon stockholders in national banks, the necessity for the assessment and the amount of it are not open to question in a suit against stockholders. *Bushnell* v. *Leland,* 164 U. S. 684. The practice under our state banking law places the circuit judge in the position of the comptroller under the national banking act. *Citizens' Savings Bank* v. *Ingham Circuit Judge,* 98 Mich. 173. The petition for the appointment of the receiver is addressed to the circuit judge, and he makes the appointment. The receiver is an officer of that court. That court, by the terms of the statute, has jurisdiction to determine the necessity for making an assessment and the amount thereof.

The contention of defendants cannot be sustained.

The liability of the stockholders is fixed by statute. It is not a mere collateral undertaking. When the bank became insolvent, and closed its doors, the depositors were entitled to an immediate payment of their money; and, when it was shown that the assets were insufficient to pay them, it became the duty of the stockholders to pay in the necessary amount, not exceeding the par value of the stock, to meet the demand. The obligation or liability of the stockholders is contractual, and not penal. *Western National Bank* v. *Lawrence*, 117 Mich. 669. The stockholder is something more than a surety; he is one of the associates in the bank, and by the terms of the association he is deemed to undertake for the debts of the depositors. *Grand Rapids Savings Bank* v. *Warren*, 52 Mich. 561; *Hobart* v. *Johnson*, 8 Fed. 493. Banking is carried on for the benefit of the stockholders. They are the only persons who profit by it. Depositors place their money in the bank in reliance upon the fact that they may withdraw it at any moment, or at a stated time. When demand is made for it, stockholders are liable for its immediate payment. The statute casts this burden upon them. It is one of the conditions imposed by the statute upon which stock may be issued and held. It became the duty of the receiver here to pay depositors at once, and, if the assets of the bank were insufficient for that purpose, he was bound to ascertain the amount necessary to meet the deficit. He took the proper steps to ascertain the necessity, and the court, upon the testimony, determined the amount which should be paid in.

Counsel for some of the stockholders cite the following cases from other States upon the proposition that no proceedings can be taken against the stockholders of a corporation until the assets have been first exhausted: In *Farmers' Loan & Trust Co.* v. *Funk*, 49 Neb. 353, the action was by a depositor against a stockholder, and it was held that the creditor had no right to maintain an action at law in its own right against the individual stockholder of the bank, merely as such, for the collection of

an amount equal to the par value of the stock. The court also discussed the question of the right of creditors and of the receiver under the banking law to proceed against stockholders before exhausting the corporate assets. Section 4, subd. 7, art. 11, of that constitution, provides:

"Every stockholder in a banking corporation or institution shall be individually responsible and liable to its creditors, over and above the amount of stock by him held, to an amount equal to his respective stock or shares so held, for all its liabilities accruing while he remains such stockholder."

Section 4, subd. 4, art. 11, entitled "Miscellaneous Corporations," provides that, before enforcement of individual liabilities of stockholders, there must be judicially determined the indebtedness proposed to be enforced and the assets of the corporation be first exhausted. It was held that this last provision was applicable to banking corporations, as well as others.

The case of *Ueland* v. *Haugan*, 70 Minn. 349, was decided upon the wording of the statute of that State, and a distinction was made between that procedure and the procedure under the national banking act. The principle here involved was not there involved. The same may be said of the case of *Cleveland* v. *Burnham*, 55 Wis. 598. But in the case of *Booth* v. *Dear*, 96 Wis. 516, the action was under the banking law of that State, which provides that the stockholders of a State banking corporation shall be individually responsible to the amount of their stock for its indebtedness. The court said:

"Such statute received construction at an early day to the effect that the liability is primary and absolute, and attaches the moment the debt is contracted by the bank; that it is a liability of all the stockholders to all the creditors, on the principle of a copartnership, the stockholders standing on substantially the same footing as though they were partners, save, only, that the responsibility of each is limited to a sum equal to his share or shares of stock. Subject to this limitation, they are answerable as original and principal debtors, and their liability more nearly

resembles that of copartners than any other with which it can be compared."

The court in that case further held that the statute did not require that the assets of the corporation should be fully exhausted before the creditors could proceed to judgment against the stockholders.

The case of *Hanson* v. *Donkersley*, 37 Mich. 184, upon which counsel for defendants rely, was brought under 1 How. Stat. § 4017. That statute provides for the organization of mining and manufacturing companies. It imposes upon stockholders an individual liability for labor done for the corporation, and allows it to be enforced against the stockholders only after the return of an execution unsatisfied, thus making the liability secondary, and not primary; and the remarks of Mr. Justice CAMPBELL in that case have no bearing here. The same may be said of the case of *Kamp* v. *Wintermute*, 107 Mich. 635, brought under a like statute, and of *Voight* v. *Dregge*, 97 Mich. 322, brought under the street-railway act. Each of these acts provides for the return of an execution unsatisfied before the action can be brought against the stockholders. The banking law does not provide for this, and was evidently intended to make the liability of each stockholder primary, and not secondary. As was said in *Grand Rapids Savings Bank* v. *Warren, supra:*

"The shareholder is something more than a surety; he is one of the associates in the bank, and by the very terms of the association he is deemed to undertake for the debts which the bank contracts."

It is evident that the banking law of 1887 was framed with great care to insure safe banking, and with a view to protect the depositors by compelling the payment by stockholders of a sum equal to the amount of stock held. This fund should become immediately payable when the necessity for its use is determined and the amount fixed, without waiting to exhaust the assets of the bank, if it appears that the stockholders will ultimately be called upon

to make good the amount. Banking institutions have relations with the public wholly unlike any other business institutions, and the rights of depositors in banks have been carefully guarded by the act. We think the contention of counsel for the receiver is sound in principle and must be sustained.

Counsel for defendants contend that the act is unconstitutional, for the reason that it limits the personal liability of stockholders to depositors, while the Constitution provides that they shall be liable for all debts. This contention cannot be sustained. Section 3, art. 15, of the Constitution of this State, provides:

"The officers and stockholders of every corporation or association for banking purposes, issuing bank notes or paper credits to circulate as money, shall be individually liable for all debts contracted during the term of their being officers or stockholders of such corporation or association, equally and ratably, to the extent of their respective shares of stock in any such corporation or association."

This constitutional provision relates to banks of issue only. The People's Savings Bank was not a bank of issue. The provisions of the banking law do not come within this constitutional provision. It is limited to banks not of issue. The legislature had the power to impose the conditions prescribed in the act upon banks organized under the act, and to limit the liability of the stockholders to depositors. In *Allen* v. *Walsh*, 25 Minn. 543, this precise question was raised under a somewhat similar constitutional provision, and it was held that that provision was confined to banks of issue, and did not limit the power of the legislature as to banks not of issue. See, also, *Harper* v. *Carroll*, 66 Minn. 487; *Allen* v. *Clayton*, 63 Iowa, 11 (50 Am. Rep. 716).

One of the most important questions in the case relates to the inquiry whether, when a bank suspends, those who are the then stockholders are liable under this statute to those who are then its depositors. It is the contention of

some of the stockholders that those who were stockholders when each deposit was made are liable to depositors; that is, that a stockholder can be called upon to respond to those only who became depositors while he was a stockholder. It is insisted, therefore, that the rule of *Kamp* v. *Wintermute*, 107 Mich. 638, should be applied. That action was brought under an act to revise the laws providing for the incorporation of manufacturing companies, and it was held that statute could not have so broad a construction as to hold one liable who purchases stock in a corporation after the debt is contracted; that is, that a stockholder, under the act, cannot avoid the statutory liability to creditors who are such at the time he transfers his stock, and that the tranferee does not take the stock subject to such statutory liability. Several cases were cited in that case to sustain that principle. That statute, and the statutes of other States under which the rulings were made, had reference to corporations other than banking. They provide a remedy for the individual creditor against the individual stockholder, so that it is not difficult for any individual creditor to ascertain who were the stockholders at the time the debt was created. The liability imposed by these statutes is for the whole debt. A man with five shares of stock of the par value of $50 may be held to pay a labor debt of $500. The effect of these statutes is to make shareholders, as to labor debts, partners, each liable for the entire debt. Our banking statute does not give this remedy to the creditor. It can be enforced only by a bank in process of liquidation, or by a receiver or other officer succeeding to the legal rights of the bank, in a suit at law or in equity. The distinction between the banking statute and these other statutes, and the construction to be placed upon them, so far as concerns the rights and liabilities of stockholders, is well stated by counsel for the receiver, as follows:

"(a) In a partnership, all partners are liable for all debts. Corporations are formed for the purpose of avoiding the personal individual responsibility of those associat-

ing, and making the capital stock and assets of the corporation the sole fund for creditors. But the legislature may, and by the constitution of a State is sometimes directed to (sometimes the constitutional provision is self-executing), grant charters on condition that the partnership or common-law liability of the associates as to certain kinds of debts shall continue.

"(b) The legislature does so except or preserve a partnership or common-law liability or obligation when it makes all stockholders liable for all debts of a certain kind or class, and provides a direct or personal remedy to the individual creditor of the corporation. In such cases it is held that the stockholders at the time the debt is contracted are like partners, at once and personally liable to pay it,— an obligation not shifted by transfer of stock.

"(c) When, however, the legislature has not plainly so attempted to preserve or retain for creditors a liability and remedy which, but for the law of corporations, would exist, but has in the incorporating act added a liability, limited, peculiar, purely statutory, and not in any sense preservative of common-law liability, the remedy provided being for all creditors, or all of a class of creditors, enforceable in their joint interest against the body of stockholders, then the liability attaches when the right of action — the default —occurs, and is against those who are then stockholders."

It is not claimed that these propositions are recognized in all the cases, but counsel submits them as deducible from the cases, and claims that by them the cases may be the better harmonized, and a reasonably safe rule of construction presented. In this contention we agree with the learned counsel. In some of the States, the banking statute itself fixes the rights and liabilities of stockholders in express terms. The New York statute provides that "no action shall be brought against a stockholder after he shall have ceased to be a stockholder." Laws 1892, chap. 688, § 55. In Wisconsin, the statute expressly declares that a shareholder by transfer shall, in proportion to his shares, succeed to all the rights, and be subject to all the liabilities, of prior shareholders. Rev. Stat. 1858, chap. 71, § 5. In Nebraska, the constitution provides that the stockholder shall be liable, etc., while he remains such stockholder. Const. art. 11, § 4, subd. 7. In Minnesota, by

statute, the liability continues for one year after any transfer or sale of stock by any stockholder. Gen. Stat. 1894, § 2501. In Iowa, the stockholder's statutory liability is while he remains a stockholder. Laws 1880, chap. 208, § 1. Our statute (3 How. Stat. § 3208e5) simply provides that "the stockholders of every bank shall be individually liable, equally and ratably, * * * for the benefit of the depositors in said bank," etc., and by the same section provides that such liability may be enforced, in a suit at law or in equity, by any such bank in process of liquidation, or by any receiver, etc. It seems clear to us that it was the legislative intent that the stockholders liable to depositors are those who are such at the time the bank becomes insolvent, without reference to the time when the deposits were actually made. Any other construction would practically repeal the entire liability clause. It is within the knowledge of all that deposits in banks are changing hourly during each day's business, thus creating uncertainty concerning the true amount on deposit at any given time. When a bank closes its doors, this change ceases. If the man who has a balance on deposit at the time the bank is closed must ascertain who were the stockholders at the time he made his deposit, and must proceed against them, there could be no common suit by a receiver for the benefit of all the depositors; for the stock in the bank might have been many times changed during the time deposits were made, and no rate could be established. It is more reasonable to hold that the purchaser of stock takes it, as a proportionate share of the bank's assets, subject to the bank's debts. With these rules in view, we may now proceed to determine the special claims made by the several defendant stockholders.

Defendant Chatterton became the registered owner of 25 shares of stock on April 1, 1892. This certificate was afterwards surrendered and divided; one for 20 shares being retained by him, and one certificate issued to his son, Floyd M., for the other 5 shares. Defendant Chatterton remained the owner of these 20 shares at the time

the bank closed.   He claims he should not be held as a shareholder because he purchased his stock upon false representations made as to the value of the stock by the officers of the bank.   As we have said, the receiver represents the depositors in this suit.   It is their rights which are to be protected.   The question here raised was squarely presented in *Bissell* v. *Heath,* 98 Mich. 472, and it was held that a stockholder, after having purchased his stock and registered it, receiving dividends, which he retains, and permitting the depositors to rely upon his apparent ownership, cannot repudiate his liability on the ground that he was induced to purchase his stock through fraudulent representations as to the financial condition of the bank.   In that case, Mr. Justice MONTGOMERY cited with approval the case of *Stone* v. *City & County Bank,* 3 C. P. Div. 282, in which it was held that where the corporation has gone into liquidation, and is proceeding, under the winding-up act, to make calls to satisfy claims of creditors, it is too late for one who has, up to that time, allowed his name to appear as a stockholder, to avoid liability on the ground that his subscription was obtained by fraud.   The rule stated must be applied to defendant Chatterton.

Defendant Fraser became the owner of 10 shares of stock December 31, 1895, and remained the ostensible owner up to the time the bank closed.   He makes the like claim as defendant Chatterton, and his case must be governed by the same rule.   The decree below fixes the liability of these defendants at 70 per cent. of the par value of their respective shares, and must be affirmed as to them.

It appears that defendant Mifflin held a certificate for 5 shares, dated April 1, 1892.   As to these shares he admits he was the registered owner, and liable to the assessment levied.   The receiver contends that Mr. Mifflin is the owner of 5 other shares, and liable to pay an assessment upon them.   This Mifflin contests.   These shares were issued originally to Hart Row.   It appears from the testi-

mony that this certificate was left by Row with Mr. Dyer to be sold, and that on September 4, 1895, Dyer sold it to Mifflin for $95 a share, Row paying him a commission of $10. Mr. Row says that he learned from Mr. Otis, the teller of the bank, that the stock had been sold. Mr. Otis testified that Mr. Mifflin came to the bank, and, after consulting with the cashier, he (Otis) was directed to loan Mifflin $500 on his note, which he did, and that Mifflin left with him (Otis) $475 of the $500, requesting him to place it to the credit of Mr. Row. This was done. Mr. Mifflin, on the same day, left with Otis the certificate of shares as collateral to his note. This certificate was placed in an envelope, and marked "Elgin Mifflin." It was assigned in blank by Mr. Row. The matter stood in this way, except for partial payments on the note by Mr. Mifflin, until July 13, 1896,—about 10 months. The transfer was never made upon the books of the bank. The Mifflin note was paid, partly before and partly after the receiver was appointed. Mifflin, upon final payment of his note, being tendered the stock, refused to take it from the bank. The defense now made is that, in enforcing the liability of stockholders, the court will not go beyond the registered holders. There is no doubt, under this state of facts, that Mr. Mifflin was the owner of the stock, and could have compelled a transfer upon the books of the bank. He became a stockholder, had the right to attend meetings and to share in the profits, and, in fact, was entitled to the rights of every other stockholder. *McLean* v. *Charles Wright Medicine Co.*, 96 Mich. 479. Being entitled to all the rights of a stockholder, he cannot escape the liability of such stockholder. The mere fact that the stock had not been transferred on the books of the bank cannot aid the defendant. The stock was fully paid for, and Mifflin was a stockholder within the meaning of the banking act, and the court below was not in error in so holding.

Defendant Edmonds was a registered stockholder, as appeared by the books of the bank when it closed. He

seeks to avoid liability on the ground that he was discharged from the ownership, and from liability as a stockholder, by a sale and transfer of the stock in December, 1894, or January, 1895. It appears, from the testimony of Mr. Edmonds and of Mr. Otis, the teller of the bank, that on the strength of a promised purchase of this stock by Mr. Osband, the cashier of the bank (for himself, not for the bank), Mr. Edmonds overdrew his account at the bank $300. He transferred the stock to Mr. Osband individually. Six days later he received his pass-book from the bank, and it still showed the overdraft. On January 15th he went to the bank, and asked Osband if he had given him (Edmonds) credit for the $300. Osband replied that he had not, but would. Osband then, in the presence of Edmonds, instructed Mr. Otis to place upon Edmonds' pass-book a credit of $300. Otis did so, then and there making as a part of the entry the letters " C. H. O." (meaning C. H. Osband). Osband never paid the bank. The certificate of stock was found by the receiver in an envelope marked "Edmonds." No entry was made on the bank's books to show the transaction, nor any part of it. A dividend paid in July, 1895, was credited to the interest account of the bank. The overdraft of Edmonds still appears on the books of the bank as unpaid. It is claimed by counsel for the receiver that Edmonds was legally bound to see that Osband actually paid his (Edmonds') indebtedness to the bank, and that, under the circumstances, he had no legal right to rely upon Osband's doing it at some time in the future. We cannot agree with this contention. The sale to Osband was completed. The stock had been assigned, delivered, and paid for. The money had been paid to Mr. Edmonds by direction of Osband, the cashier. There is no showing that Mr. Edmonds did not act in the utmost good faith, and counsel for the receiver says in his brief: "I presume that Mr. Edmonds thought that Osband would in some way and at some time make the matter right." The bank continued

to do business some 18 months after this transfer to Osband. The stock was in Osband's hands as owner.   He controlled it, and had all the rights of a stockholder thereunder. Mr. Edmonds made no claim thereafter to it.   We think the case is ruled by *Snyder* v. *Foster*, 19 C. C. A. 406, 73 Fed. 136, and *Whitney* v. *Butler*, 118 U. S. 655.

In *Snyder* v. *Foster* it appeared that Snyder subscribed for 50 shares of the stock of a national bank, borrowing the money from Collins, the cashier of the bank. As collateral security for the money so borrowed, he indorsed over the certificate to Collins, and left it with him. A few months later he sold the stock to Collins for the amount of the loan and accrued interest, the certificate remaining in the hands of Collins.   The bank was solvent at the time, and so continued for five years, during which time Collins collected the dividends on the stock, as shown by the bank's dividend book, but the stock was never actually transferred to Collins on the books of the bank. The by-laws of the bank provided that dividends should be paid to the stockholders in whose names the stock should stand, that certificates should be issued by the president and cashier, and that, when stock was transferred, the certificate should be canceled and a new one issued.   Long after the sale to Collins the bank became insolvent, an assessment was made on the stockholders, and the receiver of the bank, finding Snyder's name as a stockholder on the books of the bank, brought suit against him.   It was held that it might be inferred as a fact from the evidence that the bank had notice of the transfer of the stock by Snyder to Collins, and the termination of Snyder's relation to the bank as a stockholder, from which fact the legal presumption would follow that the bank would cause such acts to be done in relation to the transfer as its officers were called upon to do, and that the jury would be permitted to draw such inference.

In *Whitney* v. *Butler, supra*, it was said:

"It was suggested in argument that the defendants

should have seen that the transfer was made. But we were not told precisely what ought to have been done, to this end, that was not done by them and their agents. Had anything occurred that would have justified the defendants in believing, or even in suspecting, that the transfer had not been promptly made on the books of the bank, they would, perhaps, have been wanting in due diligence, had they not, by inspection of the bank's stock register, ascertained whether the proper transfer had in fact been made. But there was nothing to justify such a belief or to excite such a suspicion. Their conduct was, under all the circumstances, that of careful, prudent business men; and it would be a harsh interpretation of their acts to hold * * * that they allowed or permitted the name of Whitney to remain on the stock register as a stockholder."

In the present case, we think that Mr. Edmonds, having delivered the certificate, properly assigned, to Osband, who was cashier of the bank, and who had control of the stock register, did all he was bound in duty to do to complete the transfer. Nor do we think that, because he was paid from the bank's money, he was bound, at his peril, to see that the cashier repaid it to the bank. The rights of the parties are no other or different than as though Osband paid it from his own pocket. Where he obtained the money was a matter between him and the bank, concerning not in the least Mr. Edmonds, who had every reason to believe that Osband would adjust his account with the bank in the proper manner. There is nothing in the case which would now justify us in regarding Mr. Edmonds as still a stockholder.

The defendant Jacob Stahl has a different defense from the other stockholders. He was the registered owner of 10 shares of stock, the certificates for which were issued to him in 1895 and 1896. On May 20, 1896, he sold and assigned those certificates to his brother-in-law, George Schuman, of Cleveland, Ohio, receiving therefor $700 in cash and $300 in settlement of a claim which Schuman had against him. The assignments were properly made on the backs of the certificates. Mr. Stahl took them to the bank, and asked that new certificates be issued, which

the cashier agreed to do. This was neglected by the cashier. Soon after the sale of the stock, Mr. Stahl learned that the stock was assessed to him, and went to see the cashier about it, who said: "That is all right. The stock is transferred, and I will give you a writing to that effect." He then gave him the following writing:

"May 24, 1896.
"Mr. Jacob Stahl has transferred his stock in this bank to George Schuman, of Cleveland, Ohio.
"C. H. OSBAND, Cashier."

When the bank closed on July 11, 1896, the certificates were in the bank, and no transfer had been made on the books of the bank. The sale to Mr. Schuman is not disputed. The consideration is not denied, and the proofs show that Schuman was a man of considerable means. He died soon after this purchase, leaving an estate estimated at $15,000 to $20,000.

Some intimation is contained in the brief of counsel for the receiver that this was not a good-faith sale. We have examined the testimony with some care, and we are unable to say that Mr. Stahl was not acting in good faith. There is nothing in the evidence to show that he knew or suspected that the bank was in failing circumstances, and that he assigned this stock to avoid liability as a stockholder.

It is the contention of counsel for the receiver that, at the time of this sale, the bank was wholly insolvent, and for that reason, and the reason that Schuman was a nonresident, Mr. Stahl should be held liable as a stockholder. The case is different from that of Mr. Edmonds. There it could not be said that the bank was insolvent at the time of the sale to Osband, and Osband, the purchaser, was a resident of the State. Considerable testimony was given in the case as to the condition of the bank for nearly a year before it closed its doors. The court below found that the bank was insolvent at the time Mr. Stahl made the transfer to Schuman, and remained so until it closed its doors; and we think the testimony sustains this finding.

But, as we have said, there is no testimony showing that Mr. Stahl knew this fact. Can he, then, be held liable, though he did not know it? The court below ruled that he could be so held, because, if he had brought a proceeding against the officers of the bank to compel a transfer by them upon the books of the bank, and they had shown that the bank was then insolvent, and the transfer was to a nonresident, the transfer would not have been enforced by the courts, as it would. defeat the depositors of that much of the fund. This is not the true test of Mr. Stahl's liability, and the rule laid down by the circuit judge cannot be sustained. The act under which suit is brought by the receiver is very much like the national banking act, and the rules laid down by the federal courts in reference to the liability of stockholders have great weight in determining the questions here presented. The rule laid down by the federal courts seems to be that the burden is upon the receiver of a national bank to show that a transfer of stock was made by the stockholder for the fraudulent purpose of avoiding liability as such stockholder. *Sykes* v. *Holloway*, 81 Fed. 432. Thompson, in his work on Liability of Stockholders (section 215), lays down the rule that a transfer of shares in a failing corporation, made by the transferrer with the purpose of escaping his liability as a shareholder, to a person who, from any cause, is incapable of responding in respect to such liability, is void as to the creditors of the company, and as to the other shareholders, although, as between the transferrer and the transferee, it was out and out; citing *Nathan* v. *Whitlock*, 9 Paige, 152; *McClaren* v. *Franciscus*, 43 Mo. 452; *Marcy* v. *Clark*, 17 Mass. 330; *Johnson* v. *Laflin*, 5 Dill. 65. This proposition by Judge Thompson is quoted with approval by the court in *National Bank* v. *Case*, 99 U. S. 631. It was said by the court in *Bowden* v. *Johnson*, 107 U. S. 261:

"But it was held by this court in *National Bank* v. *Case*, 99 U. S. 628, that a transfer on the books of the bank is not in all cases enough to extinguish liability.

The court in that case defined, as one limit of the right to transfer, that the transfer must be out and out, or one really transferring the ownership as between the parties to it. But there is nothing in the statute excluding, as another limit, that the transfer must not be to a person known to be irresponsible, and collusively made, with the intent of escaping liability, and defeating the rights given by statute to creditors."

With these restrictions, and certain others which it is not important to enumerate here, as they do not affect the rights of the parties in this case, it is, we think, well settled by the adjudicated cases that the stockholder has the right to make an out and out *bona fide* sale to any person capable in law of taking and holding the same, and of assuming the liabilities of the transferrer in respect thereto. This right of transfer is of great benefit to stockholders. It is what gives value to the stock. The fact that the shares are transferable on the books of the bank does not limit the right of transfer and to pass the title to the transferee. It is true that the officers of the bank will not be compelled to make the transfer on the bank's books, under the provisions of section 3208a8, 3 How. Stat., when the transferrer is indebted to the bank. *Citizens' State Bank* v. *Kalamazoo County Bank*, 111 Mich. 313. But no such claim of indebtedness is here made, and it is well settled that the title passes to the transferee the moment the assignment is made and stock delivered. *Johnson* v. *Laflin, supra*. The purpose of requiring a transfer on the books of the bank is that the bank may know who are the stockholders, and, as such, entitled to vote, receive dividends, etc., and for the protection of *bona fide* purchasers of the shares, and of creditors and persons dealing with the bank. It does not restrict the right of the owner to transfer his stock, but clothes the corporation with the power to register *bona fide* transfers. *Black* v. *Zacharie*, 3 How. 483; *Union Bank* v. *Laird*, 2 Wheat. 390; *St. Louis, etc., Ins. Co.* v. *Goodfellow*, 9 Mo. 149; *Moore* v. *Bank of Commerce*, 52 Mo. 377; *Hill* v. *Pine River Bank*, 45 N. H. 300.

No showing is made here that the bank officers refused to make the transfer on the bank's books. Instead, the cashier, who had the power to make it, promised to do so, and led Mr. Stahl to believe that the matter had been properly arranged, so that he was released from liability thereunder and Mr. Schuman protected as a *bona fide* purchaser. Mr. Stahl had a right to rely upon this.

We do not think that the fact that Mr. Schuman was a nonresident can affect the rights of Mr. Stahl. There is nothing in the act which limits transfers to residents of the State. A nonresident may own such shares, and become liable thereunder, the same as a resident owner; and we know of no reason why such liability cannot be enforced in Ohio as well as here. The engagement by the stockholder is contractual, and may be enforced in the courts. *Western National Bank* v. *Lawrence*, 117 Mich. 669. We are aware that Spelling on Private Corporations, at section 469, lays down the rule that the right to transfer terminates by insolvency and dissolution, and that even before the insolvency is made public, if it actually exists, to allow stockholders to transfer their interests to persons beyond the jurisdiction of the court would be opening the door to subterfuges calculated to defeat the claims of creditors, and that creditors might defeat such transfers; but he cites no authorities to sustain this proposition, and, on the contrary, says a number of cases maintain the opposite,—citing the case of *Johnson* v. *Laflin, supra*. We think Mr. Stahl cannot be treated as a stockholder, and held liable as such.

Defendant Row was the owner of stock on the first organization of the bank. When it was reorganized, he received a stock dividend, and increased his holding to 25 shares. This was April 1, 1892, and his stock stood in his name on the books of the bank until July 8, 1896, when it was transferred to his son. The bill in this case, after charging the insolvency of the bank and of the son of Mr. Row, to whom the stock was transferred, alleges: " Said Row suspected or believed said bank to be insolvent,

and such transfer was made by him for the purpose of escaping liability as a stockholder in said bank." There is no testimony to sustain the charge that Mr. Row believed or suspected the bank to be insolvent, and that he made the transfer to avoid liability. The bank had been doing business in the usual way up to the time the transfer was made on the books of the bank. It appears that Mr. Row had made advances of like amounts of property to his other two sons, and to equalize the gifts to them he gave this stock to his son Charles. It was consummated by the surrender of the certificate of stock to the proper officer of the bank on June 20th, with instructions to make the proper entry on the stock book to make the transfer complete. On July 8th the proper entry was made, and the certificate delivered to the son; and the bank failed and closed its doors on the 11th, or three days later. It was a completed gift of the stock to the son, and without any knowledge on the part of the donor that the bank was insolvent. The sole question, therefore, is, Did such *bona fide* transfer by gift relieve the transferrer from liability under the statute? This liability is purely statutory, is in derogation of the common law, and must be strictly construed. Courts will not hunt excuses to carry it beyond the plain provisions of the statute. 1 Cook, Stock, Stockh. & Corp. Law, § 214. All the authorities recognize the right to transfer in good faith and for a valuable consideration. When this is done, and the bank is a going one, statutory liability attaches only to those who are stockholders at the time the bank closes, either by action of its directors, by the action of the commissioner of banking, or by proceedings in chancery to wind up its affairs.

The learned counsel for complainant cites no decision to sustain the proposition that a *bona fide* gift and transfer of stock does not relieve the transferrer from liability. His quotation from 1 Cook, Stock, Stockh. & Corp. Law, § 395, does not treat of the question now before us. The author is treating solely of the "rules for corporations in regard to refusing or allowing registries of transfers of

stock." The question the author is discussing is no other than whether a corporation may refuse to register a transfer to an irresponsible transferee. He reaches the conclusion that the officers of the corporation may refuse to do so when the corporation is insolvent, but cannot refuse when the corporation is solvent. The power of the officials of the bank to register transfers is not before us. We are dealing with a case where the transfer has been made. The cases all seem to hold that the intent to avoid liability is a material element in determining the liability of one who has transferred his stock while the corporation was a going one. If this transfer had been made for a valuable consideration, it would, under the authorities, be valid, and relieve the transferrer from liability. No case is cited by counsel which makes a distinction between a good and a valuable consideration. The statute does not restrict, and is not intended to restrict, the transfer of the stock of a bank. The courts, in order to preserve the statutory liability for the benefit of creditors, have held that transferrers in bad faith, no matter what the consideration received, are still the equitable owners of the stock for the purpose of responding to the creditors.

Counsel for complainant relies largely upon the case of *Stuart* v. *Hayden,* 169 U. S. 1. The question here considered was not involved in that case, and there is nothing to show that it was considered by the court. The case was decided upon the intent of the stockholder to avoid his liability. The court used this language:

"Whether — the bank being in fact insolvent — the transferrer is liable to be treated as a shareholder, in respect of its existing contracts, debts, and engagements, if he believed in good faith, at the time of transfer, that the bank was solvent, is a question which, in the view we take of the present case, need not be discussed, although he may be so treated, even when acting in good faith, if the transfer is to one who is financially irresponsible."

It appears, from this, that the question was not discussed by the court, and the last clause must be considered as mere *dictum.*

The precise question was raised and decided in *Sykes* v. *Holloway*, 81 Fed. 432, in May, 1897. The facts are substantially parallel with those in the case before us. The question is thus stated:

"We must presume, from the evidence in this record, that this transfer was made, not for a valuable, but for a good, consideration only, and that it was in fact an out and out transfer, made without knowledge or notice of the embarrassed condition of the bank; yet it was made by a mother, who could respond to her liability as a stockholder, to a daughter, who could not then respond in any degree to that liability. It therefore, to that extent, impaired the security of the existing creditors of the bank; and the inquiry is whether that fact, which was known to Mrs. Holloway, is sufficient to cause the setting aside and cancellation of said transfer."

The learned judge in that case said:

"I find in the decisions some broad expressions which would seem to sustain the contention of the complainant, but I have been unable to find any case in which the pecuniary condition of the transferee is a material element on the question of sustaining the transfer. It is a most material matter where the inquiry is whether or not the transfer is a *bona fide*, out and out transfer, or a mere sham; but, as far as we have examined the cases, none of them go to the effect that if the transfer, though without a valuable consideration, was *bona fide*, and the transferrer had no knowledge of the embarrassed condition of the bank, and no information which would have given him or her such notice, such transfer is invalid or fraudulent. * * * It seems to us that, upon principle, the pecuniary condition of the transferee of stock in a national bank at the time of the transfer, while material upon the inquiry of whether or not the transfer is *bona fide* or colorable, cannot be a decisive element on the question of liability of the transferrer, where the transfer has been made out and out, without knowledge or notice of the failing condition of the bank. Such a test of liability of a transferrer of stock would materially destroy the transferability of such stock, and would be an impracticable test to apply; and even though it be conceded, as in this case, that the consideration for the transfer was a good, but not a valuable, one, that fact should not be sufficient to set aside and make fraudulent the transfer."

It must be assumed that the learned counsel in the present case has carefully examined the decisions, and cited us to all there are upon the subject. Probably the reason that there are no more decisions upon the precise question is that cases have seldom arisen involving it. The courts of England hold that the shareholder is not liable where he has made an out and out transfer, and do not consider the motive; holding, however, that where the transfer is merely colorable, or to a mere dummy, the shareholder retains such an interest as makes him liable. The courts of this country have, as already shown, gone further, and hold the transferrer liable when they find an intent to escape the statutory liability. We see no reason why the rule should be carried further. To hold otherwise would be to hold the stockholder liable where he has made a *bona fide* gift of the same for a good consideration, and to continue his liability for months, and even years, afterwards, if evidence can be produced that at the time the bank was embarrassed. The law contains no language to justify an implication that it was intended to impose this double liability upon *bona fide* transferrers of stock. We think that courts are not justified in reading such a liability into it.

The decree must be affirmed as to defendants Chatterton, Fraser, and Mifflin, with costs, and reversed as to defendants Edmonds, Stahl, and Row, and as to them the bill will be dismissed, with costs of both courts.

The other Justices concurred.