HERMAN HENNEBERGER v. ELIAS MATTER.

*Principal and agent—Evidence—Promissory note—Bona fide purchaser—Fraud.*

1. Agency cannot be established by testimony as to the statements of the alleged agent relating to the *fact*, or to the possession of any of the *indicia*, of agency.

2. It cannot be assumed that the sale of a patent is fraudulent, or that, because it afterwards turns out to be of little or no value, that fact alone indicates fraudulent intent in the vendor.

3. While it is true that fraud need not be shown by direct proof, and may be, and generally is, proven by inference from facts and circumstances, yet it cannot be presumed from mere suspicion, nor from facts or circumstances which are entirely consistent with an honest purpose.

4. The evidence in this case is held insufficient to support the finding of the court that the plaintiff was not a *bona fide* purchaser of the note sued upon; there being no competent testimony to support the further necessary finding that plaintiff's alleged agent had possession of plaintiff's stock at the time

of the sale of certain other stock to the defendant, or during the negotiations which led up to its sale, and the giving of the note in payment for the same.

Error to Kent. (Burch, J.) Argued June 11, 1891. Decided November 20, 1891.

*Assumpsit.* Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Taggart & Denison,* for appellant.

*McGarry & Ford,* for defendant.

McGRATH, J. Plaintiff brings suit upon the following promissory note:

" $750.00. GRAND RAPIDS, February 5, 1889.

" Six months after date I promise to pay to Fred Kaltenbeck, or order, seven hundred and fifty dollars, at the office of Nelson, Matter & Co. Value received.

"ELIAS MATTER."

The note is indorsed as follows:

"FRED KALTENBECK.

"W. M. STARLEY.

"T. WINTER."

The cause was tried by the court, who found for the defendant, and plaintiff appeals. The court presented the following findings:

"The plaintiff is a commission merchant, residing at Mt. Pleasant, Westchester county, N. Y., and having his office at 317 Washington street, New York city. During the time covered by negotiations which resulted in the giving of the note in suit, the plaintiff was stockholder, director, secretary, and treasurer of the International Automatic Car-coupler Company. This company was a corporation organized under the laws of the state of New Jersey, and had its business office at 317 Washington street, New York city, in the office of the plaintiff. The property of the company consisted of letters patent of the United States, some draw-bars, models, and

patterns. It had no shop for manufacturing draw-bars or car-couplers, and it had not, to plaintiff's knowledge, any contracts from any railroad company to use its draw-bars. It was organized as early as January 13, 1887. The plaintiff was vice-president in 1887, before being elected secretary and treasurer. The president of the company was one Thomas Winter, and said Fred Kaltenbeck was a stockholder. The plaintiff and said Winter had been informed on or about January 17, 1887, that the invention was an infringement. The most of the stock was held by eastern parties.

" The defendant is a member of the firm of Nelson, Matter & Co., manufacturers and wholesale dealers in furniture in Grand Rapids. About the middle of December, 1888, the said Fred Kaltenbeck came to the office of said defendant with a model of a car-coupler belonging to the International Automatic Car-coupler Company, and left it on the desk of defendant. He also brought with him a patent hat-rack, which he claimed to desire the defendant's company to manufacture. About four weeks afterwards, Kaltenbeck came to defendant's office again, and commenced a conversation about the car-coupler, the model of which he allowed to remain on defendant's desk during his absence. During the conversation the said Kaltenbeck exhibited to the defendant a number of certificates of stock, indorsed in blank, of the International Automatic Car-coupler Company, and represented that the patents that belonged to the company were worth $50,000; that it had procured and then had an order from the Detroit, Lansing & Northern Railroad Company for sufficient draw-bars so that the profit thereon would realize the sum of $1,000; that the coupler was a new and valuable improvement, and was in use on the D., L. & N. R. R., and giving good satisfaction; that the company had at the Michigan Malleable Iron Works, at Detroit, $600 worth of couplers, already manufactured and paid for, which could be immediately used to partially fill the order obtained from the D., L. & N. R. R. These representations were false. He also stated that he desired to interest the defendant in the enterprise, and would sell him twenty-five shares for $750, and desired defendant's note for that amount, due in six months. He also represented that the avails of said shares would, by the time the note fell due, earn at least

$500, and offered to give him his own note for $250, which, with the $500 the stock would earn, would equal, he claimed, the amount of said note.

"The defendant relied on these statements and representations, and gave the note on which the suit was brought, and Kaltenbeck gave the note for $250, due six months from date, and transferred to the defendant the certificate of stock.   *   *   *   *   *   *   *   *

"The plaintiff was not a *bona fide* purchaser. He was not only the promoter of a scheme by which the fraud was practiced on the defendant, but was, with others, a participant in the avails thereof.   *   *   *   *   *

"I therefore conclude, as a matter of law, that the note in question was obtained from the defendant by false and fraudulent representations; that the plaintiff was participant in the avails of such fraud; that the defendant seasonably and properly rescinded said contract, and the plaintiff is not entitled to recover.

"Passing specifically upon the points of law submitted by the plaintiff's counsel: I do not consider the fact that Kaltenbeck had in his possession the plaintiff's certificate of stock prior to or at the time of effecting the sale to the defendant, indorsed in blank, with others, as alone proving an agency in the transaction by Kaltenbeck for the plaintiff and others, but taken in connection with other facts and circumstances in the case, and especially with the receipt and distribution of the avails of such sale, conclude that his possession of such stock, indorsed in blank, was one of the circumstances which gives color to and characterizes the whole transaction as a scheme to cheat and defraud, in which the plaintiff was a participant."

The plaintiff testifies that he received the note from Kaltenbeck in March, 1889, in payment for some stock in the International Automatic Car-coupler Company; that the note was more than the amount of the stock; that he was allowed a small amount for expenses which he had incurred on behalf of the company, and that the balance was turned over in cash to Thomas Winter by direction of Kaltenbeck; that he had not previously placed the stock in Kaltenbeck's hands for sale, or to negotiate its sale; that he had not authorized Kalten-

beck, in any way, shape, form, or manner, as his agent, to offer stock for sale; that he had never intrusted or delivered the certificates of stock to Kaltenbeck to be offered for sale to anybody; that he sold his stock to Kaltenbeck for $481.50; that $60 was allowed him for expenses, which he had incurred on behalf of the company, and $191.50 was paid to Winter by check, at Kaltenbeck's direction, as part payment for stock which Kaltenbeck was at the same time purchasing from Winter, and the balance was allowed as discount upon the note; that Matter was a member of the New York firm of whom plaintiff at the time of the negotiation inquired as to Matter's responsibility, and plaintiff required the other indorsements upon the note before taking it. The check given by plaintiff to Winter was produced as an exhibit.

Winter testifies that he was present when plaintiff sold his stock to Kaltenbeck; that it was on the 21st day of March, 1889; that Kaltenbeck, at the same time, bought stock from the witness; and that plaintiff had, by Kaltenbeck's direction, paid to the witness about $200.

Upon cross-examination of the witness Winter he testified as follows:

"*Q.* But you are certain that the stock held by the eastern parties was not transferred to him in blank, so that he could take it and sell it to other parties for that particular purpose?

"*A.* Yes, sir.

"*Q.* Then, if he had any stock in said company except that issued to him, do you know how he obtained it?

"*A.* I do.

"*Q.* Well, how?

"*A.* About a year before this transaction he came to my house in Margaretville, and negotiated with me for the sale of this stock,—Mr. Henneberger's and others. * * * He told me that if we would let him take that stock to Michigan he would send us the pay for them.

I think it was $2,000. I refused to do it in that way, but told him I would make a sight draft for that amount, and send it there to some bank in the regular way in such matters, attaching this draft to the stock. I deposited the draft and stock with the Ulster Co. National Bank. It was sent to Michigan, to Stanton. The stock was indorsed in blank by the different owners at his direction. The draft was not paid. It came back with the stock, and the owners of the stock left the stock with me for safe-keeping, as president of the company. Something like eight or ten months after that Mr. Starley, of New Kingston, N. Y., a responsible man, came to me, and asked me to let him have the stock. I allowed him to take the stock, and I have his written receipt for the same in my possession at Margaretville, and he allowed Mr. Kaltenbeck to take the stock for the purpose of examining it. I do not know that, but I was informed of it. It was for the purpose of showing some one that it was a regular organized company, as Kaltenbeck stated to Starley.

"Q. Is that the only way you account for his having the stock indorsed in blank?

"A. Yes, sir.

"Q. That is all there is of it?

"A. I saw Starley let Kaltenbeck have it after that.

"Q. How did you obtain Hanneberger's stock to turn over to Starley at that time?

"A. I have told you before that it was in my hands for safe-keeping."

Re-direct examination by Mr. Hildreth:

"Q. Did Mr. Henneberger, the plaintiff in this action, know that you loaned this stock, indorsed in blank, to Starley, to be loaned to Kaltenbeck for any purpose, at the time when it took place?

"A. No, sir.

"Q. When did you first communicate that fact to him?

"A. To-day."

Winter's testimony was taken by deposition, to which the following was attached before signature:

" The foregoing deposition having been read over by

the witness, Thomas Winter, before subscribing and swearing to the same, he states that he desires to make a correction therein, which the commissioner allowed, and in person takes down as follows, to wit: I have read over the foregoing deposition, and desire to make the following correction: In examining the receipt for stock in the International Automatic Car-coupler Co. given to me by Mr. Starley at the time of the delivery of the stock to him, referred to in my testimony on page 8 hereof, I find that no part of the stock of the plaintiff, Mr. Henneberger, was included therein, and that Mr. Starley never received from me any of the stock of said company belonging to Mr. Henneberger, and Mr. Kaltenbeck never had any of the stock which belonged to Mr. Henneberger in his possession for any purpose until the 21st day of March, 1889, when 24 of said shares were sold to him by Mr. Henneberger, and regularly transferred on the books of the company. The receipt given me by Mr. Starley shows the stock actually delivered to him as stated by me on page 8 hereof, and identified by me, and attached hereto in explanation and corroboration of this correction of my testimony. My previous testimony in relation to that transaction was based upon my recollection alone."

The receipt is as follows:

"Rec'd of T. Winter fifty-seven shares of International Automatic Car-coupler Co. stock, as follows, viz.: No. 15, 25 shares, W. D. Swart; No. 13, 25 shares, T. Winter; and No. 27, 7 shares, E. A. Rase,—all of which we agree to return within thirty days, or, in case not returned as above, we hereby agree to bind ourselves to pay for the same the sum of fifteen hundred dollars on demand. And we hereby authorize T. Winter to deliver said stock to Fred Kaltenbeck.

"*Dated Margaretville, Jan.* 10, '89.

"W. M. STARLEY.
"H. A. STARLEY."

Defendant was allowed to testify, under objection, to statements made to him by Kaltenbeck, regarding the operations of the company and its prospects; that Kaltenbeck came to him in December, 1888, and left a

model of the car-coupler, on which the patents were issued, on defendant's desk.

" He said it was valuable; that the parties that were interested in it in the East were not working it to his satisfaction. He wanted to have business men interested in it that would put it on the market. I did not take any stock in it at that time, but I thought the patent was valuable; it looked plausible to me. He took the model with him, and in a couple of weeks he came back again, and exhibited certificates of stock of the International Automatic Car-coupler Company. He exhibited certificates of different denominations, and I finally bought one. * * * I think he had a half dozen, at least, of the certificates signed in blank. * * * He claimed that he had all the stock held by eastern parties, Swart, Henneberger, Winter, and they were the principal stockholders. There was a little held in Stanton, Mich., that he did not have. * * * * * * * * *

"Q. You say that Mr. Kaltenbeck claimed that he had with him certificates for all of the stock held by eastern parties. At what time did he make that claim?

"A. At the time when he came down here from Stanton.

"Q. About when was that?

"A. That was after the note was sent out here for collection. I could not tell you the date now. * * *

"Q. Did he have some certificates of stock with him then?

"A. Yes, sir.

"Q. Show it to you?

"A. Yes, sir; I think he had all the stock with him. I could not say whose stock that was,—whether Henneberger's stock was among it, Swart's, or whose it was. I think he had it all. There was only about 200 shares issued. He claimed they were a hundred dollars a share.

"Q. He had a bundle of stock there?

"A. Yes, sir. * * *' * * * * * * *

"Q. Now whether or not, in speaking about Henneberger as being one of the parties in interest when you were talking about the stock,—I wish to ask you whether or not, in talking about the company, and who composed it, if he did not hold up Henneberger as being a sharp, shrewd business man.

"A. Yes, sir.

"*Q.* Who were the parties that he talked about as owning the stock?

"*A.* He mentioned Henneberger's name frequently; that he was engaged in a large business there, and could not give this matter any attention."

The stock purchased by defendant was represented by the following certificate:

"No. 15.                                                  25 Shares.

"The International Automatic Car-coupler Company.

"This is to certify that William D. Swart is entitled to twenty-five (25) shares of the capital stock of the International Automatic Car-coupler Co., transferable only on the books of the company in person or by attorney, on the surrender of this certificate.

"*Newark, N. J., twelfth day of January,* 1887.

"William D. Swart,                      T. Winter,
          "Secretary.                          President."

Upon the back of said certificate was the following indorsement:

"For value received I hereby assign and transfer unto Elisha Matter twenty-five shares (25) of the capital stock of the International Automatic Car-coupler Company, and do hereby irrevocably constitute and appoint ———, of ———, true and lawful attorney to make the necessary transfer thereof on the books of the company.

"In witness whereof I have hereunto set my hand and seal this 10th day of January, 1889.

                                            "W. D. Swart.

"T. Winter, Witness."

Under objection, an opinion given by New York patent attorneys in January, 1887, to Winter as president, was admitted. It sustained the validity of the patent, but raised a question as to whether certain of the claims made did not infringe upon a prior patent; but in conclusion the attorneys say:

"We will observe that too much importance to the fact of Kaltenbeck infringing Grassler need not be given, because the latter patent will expire by limitation two years from November of the present year. Hence your

Kaltenbeck patent will have at least fourteen years of life free of any possibility of an infringement charge."

It will be seen that the court bases his finding as to Kaltenbeck's agency upon the fact assumed, but not found, that Kaltenbeck had in his possession at the time of his negotiations with defendant, and exhibited to defendant, plaintiff's certificate of stock indorsed in blank by plaintiff; but the only testimony tending in the remotest degree to support such conclusion was Matter's testimony that Kaltenbeck told him that he had the certificate. It is not clear from defendant's testimony just when Kaltenbeck claimed to have in his possession plaintiff's stock, whether it was at the time of the negotiations between Kaltenbeck and defendant, or some months afterwards, when defendant, Kaltenbeck, and others were planning· for the formation of a new company. The stock which was transferred to defendant was the stock of one Swart, and defendant received it February 5, 1889, while plaintiff's stock was not sold to Kaltenbeck until March 21, 1889. There was no testimony tending to show that defendant ever saw the plaintiff's certificate of stock, and no competent testimony tending to show that Kaltenbeck ever had it in his possession. Plaintiff's testimony was clear and positive that Kaltenbeck did not have possession of plaintiff's stock before its purchase in March, and there is no question but that he had possession of it after he had purchased it, and at the time that he and defendant, with others, were arranging for the formation of the new company. Upon cross-examination, defendant testifies that it was at this latter time that Kaltenbeck told defendant that he had the stock.

Kaltenbeck's agency could not be established by testimony as to his statements to defendant, whether those statements related to the fact of agency or to the possession of any of the *indicia* of agency. There was there-

fore no competent testimony to support a finding that Kaltenbeck had possession of plaintiff's stock at the time of the sale of the stock to defendant, or during the negotiations which led up to the sale, and, in the absence of such a showing, the evidence is insufficient to sustain a finding that—

"The plaintiff was not a *bona fide* purchaser. He was not only the promoter of a scheme by which the fraud was practiced on the defendant, but was, with others, a participant in the avails thereof."

Kaltenbeck's brother was the patentee. Naturally he had more faith in the possibilities of the patent than the eastern stockholders, and evidently, from the testimony, he was dissatisfied with the inactivity of the eastern company. Negotiations had been had with the Detroit, Lansing & Northern Railroad for the adoption of the coupler, and for the manufacture of the coupler by the Malleable Iron-works at Detroit. Kaltenbeck's object in the purchase of plaintiff's stock may have been the formation of a new company in this State; at least, his representations to plaintiff were in the line of and entirely consistent with such a purpose. After the sale to defendant, and the purchase of plaintiff's stock, arrangements were made by Kaltenbeck, defendant, and others for the formation of a new company.

It appeared that, nearly a year before the sale to defendant, Kaltenbeck had been negotiating with certain of the eastern holders of stock for its sale to him, with the express intention of its disposition in Michigan, and, as tending to show that the holders of that stock regarded it as of value, certain of them refused to intrust their stock to Kaltenbeck, except through the banks, with a sight-draft attached; and finally 57 shares of the stock, including the shares sold defendant, were intrusted to the Starleys, who were responsible, under an

agreement to return the stock or pay the sum of $1,500 therefor, as shown by the receipt given by the Starleys.

There was no testimony tending to show that the patent was valueless, or that plaintiff regarded it as without value, and, from aught that appears, it may be of great value. It cannot be assumed that the sale of a patent is fraudulent, or that, because it afterwards turns out to be of little value, or of no value, that fact alone indicates fraudulent intent in him who sells. The value of all undeveloped patents is prospective, largely a matter of opinion, and to some extent may be said to be visionary, and this is a matter of common knowledge.

The misrepresentations made relative to the extent of the adoption and use of the device were material as against Kaltenbeck, and would have been a good defense as against him; but there was no evidence tending to connect plaintiff with these misrepresentations, or bringing them home to him. While it is true that fraud need not be shown by direct proof, and may be, and generally is, proven by inference from facts and circumstances, yet fraud cannot be presumed from mere suspicion, nor from facts or circumstances which are entirely consistent with an honest purpose.

The judgment is reversed, and a new trial ordered, with costs to plaintiff.

CHAMPLIN, C. J., LONG and GRANT, JJ., concurred with McGRATH, J. MORSE, J., concurred in the result.