DETROIT TRUST CO. *v.* HARTWICK.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—INTERPRETATION OF STATUTES.

Question of interpretation of statute relative to transfers of trust company stock within four months of date on which petition for appointment of a receiver was filed, where stated in bill of complaint to set such a transfer aside and around which plaintiff builds its case, is considered notwithstanding defendant claims such question was not raised at the trial.

2. STATUTES—INTERPRETATION—INTENT.

The primary rule governing the interpretation of statutes is to ascertain and give effect to the intention of the legislature.

3. SAME—WHEN INTERPRETATION UNNECESSARY.

If the language employed in a statute is plain, certain and unambiguous, a bare reading suffices and no interpretation is necessary.

4. SAME—INTERPRETATION—ACT READ AS A WHOLE.

In the interpretation of a statute, effect should be given, if possible, to every word, sentence and section thereof, and to that end, the entire act must be read and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce a harmonious and consistent enactment as a whole.

5. SAME—TRUST COMPANY—TRANSFER OF STOCK—FRAUD—RECEIVERS.

Statute providing that all sales, transfers and assignments of any trust company stock, made with the intent to defraud company's creditors shall be void as against such creditors, "except as to purchasers in good faith and for present fair consideration, if made within four months prior to the filing of a petition" for appointment of receiver of such company *held*, plain, certain and unambiguous without addition or transposition of words or sentences (3 Comp. Laws 1929, § 12005).

6. CONSTITUTIONAL LAW—POLICIES OF LEGISLATION.

Courts should not indulge in judicial legislation nor be concerned with policies of legislation so long as they do not transgress constitutional limitations.

7. BANKS AND BANKING—TRUST COMPANY—STATUTES—TRANSFER OF STOCK—RECEIVERS.

Statute relative to transfers of assessable trust company stock within four months previous to filing of petition for appointment of a receiver *held*, not intended to render every such transfer void (3 Comp. Laws 1929, § 12005).

8. APPEAL AND ERROR—EVIDENCE WEIGHED BY SUPREME COURT ON TRIAL DE NOVO IN EQUITY.

On appeal in chancery Supreme Court tries case *de novo* and examines and weighs the evidence.

9. BANKS AND BANKING—TRUST COMPANY—TRANSFER OF STOCK—FRAUD—EVIDENCE.

In suit by receiver of trust company against surviving testamentary trustees to set aside transfers of assessable trust company stock from trust estate to financially irresponsible transferees, transfer *held*, void as in fraud of trust company's creditors where evidence shows such stock had suffered marked decline in value, no dividends had been paid thereon

within period of over a year prior to the transfer, trust company itself was then one of the trustees, transferees were insolvent man and wife, employed by another corporation in which transferor was interested, and that evident purpose was to avoid the anticipated stockholders' assessment (3 Comp. Laws 1929, §§ 12005, 12024).

10. EVIDENCE—INFERENCES DRAWN BY JUDGE.

It is the province of the trial judge in a non-jury case to draw legitimate inferences from the established facts and to weigh the probabilities from such established facts.

11. BANKS AND BANKING—TRUST COMPANY—TRANSFER OF STOCK—FRAUD—INTENT.

In order to set aside transfers of assessable trust company stock, made while the corporation is a going concern, plaintiff has burden of proving the transfer was made with intent to escape the statutory liability (3 Comp. Laws 1929, §§ 12005, 12024).

12. FRAUD—INTENT—EVIDENCE.

Intent as an element of fraud in transfer of assessable trust company stock is a mental condition and is determined not so much by what one says as it is by what one does.

13. SAME—INFERENCES.

Fraud need not be shown by direct proof, and may be, and generally is, proven by inference from facts and circumstances.

Appeal from Wayne; Chenot (James E.), J. Submitted June 4, 1936. (Docket No. 71, Calendar No. 39,008.) Decided December 9, 1936.

Bill by Detroit Trust Company, receiver of Guaranty Trust Company of Detroit, against James W. Hartwick and Karen B. Hartwick, surviving trustees under the will of Edward E. Hartwick, deceased, and others for decree requiring payment of stock assessment and an injunction. From decree for defendants Hartwick, plaintiff appeals. Reversed and decree for plaintiff ordered entered.

*A. W. Sempliner* (*Jason L. Honigman* and *Wm. M. Sempliner*, of counsel), for plaintiff.

*Joseph J. Kennedy*, for defendants.

BUSHNELL, J. Defendants, together with Guaranty Trust Company, were trustees under the last will and testament of Edward E. Hartwick, deceased, and as such were the owners of 100 shares of common stock of the trust company. This stock was sold on March 21, 1931, to Robah G. Hoover, who inserted the name of his wife, Mary A. Hoover, as transferee and the shares were transferred to Mrs. Hoover on the books of the company the day of its sale.

The Guaranty Trust Company of Detroit was closed by the appointment of a receiver on July 1, 1931, and later an order was entered fixing the liability of its stockholders and authorizing the receiver to sue therefor. A statement of its condition at the close of business December 31, 1930, shows the book value of its stock to be about $200 a share. It was sold to Hoover within three months thereafter for 45 cents a share and the purchaser has since received his discharge in bankruptcy.

Mrs. Hartwick, the active trustee of the estate, testified that she instructed her son to sell the stock because of the advice of her lifetime friend, Louis E. Hart, a Chicago attorney. Mr. Hart was called as a witness by defendants; he testified he told Mrs. Hartwick that bank stocks were not a proper investment for a trust estate and that they should be sold immediately. Upon cross-examination, he said:

"I made no inquiry into the price of the stock. My recollection was that it was carried at $15,000 in the inventory, but it may have been 13. I had no thought whatever as to what price they could get

for it, and that would not have changed my advice one way or the other. If I knew the best price they could have got for it was $45, I certainly would have advised them to sell anyhow. I would do that in a trust estate if I felt there was a possibility of double liability against the estate. I think it was one of the very important elements in my mind with reference to this particular estate. I did not know anything whatever about it, whether it was the strongest or the weakest bank in Detroit.''

Mrs. Hartwick was called by plaintiff and subjected to a most searching cross-examination. The trial judge devoted much of his opinion to an analysis of her testimony. We quote a portion:

''As opposed to her story we have a chain of circumstances which counsel for plaintiff is convinced is so strong that the court can come to no other conclusion here but to find that this was an attempt to get rid of this stock in order to avoid the liability. I have in mind all that counsel for plaintiff has said. I have in mind these receipts which were issued for these three certificates of stock, all bearing different numbers, all issued the same date, with the stock of the brother of Mrs. Hartwick in between the two receipts for the estate and her own stock. Now how that happened, I don't know. All I can do is to become suspicious, and I have done so. I have thought, well, the family knew about this matter and they all went down and got rid of their stock, and these receipts prove it. But that is an inference again, it is a conclusion that I can draw, and I can say my suspicion has been aroused. There again the court is confronted with a situation where I must permit a matter of suspicion and an unexplained circumstance—I am talking about these three receipts now—I must permit that to directly challenge the truth of Mrs. Hartwick's testimony, and that I cannot do. I cannot find it in my con-

science to do that, because I have not heard anything or seen anything or sensed anything, from watching this witness on the stand, which permits me honestly and conscientiously to disbelieve her.''

The remainder of the testimony largely consists of the necessary technical record proof regarding the financial condition of the trust company, the details surrounding the appointment of a receiver, the manner in which the investments of the Hartwick estate were handled, admissions of the uncollectibility of Hoover and Mrs. Hoover's lack of knowledge of the transaction. To this may be added a claim of presumption of knowledge of insolvency on the part of the trust officer who handled the estate and the inference that such knowledge is imputed to the active trustee. All of this testimony was considered by the trial judge who concluded that he was bound to accept the testimony of Mrs. Hartwick. He said:

''For that reason, if for no other, plaintiff in this case cannot prevail against this trust estate and these trustees.''

Plaintiff's appeal is submitted upon two questions:

Does the statute, 3 Comp. Laws 1929, § 12005, provide that a transfer of trust company stock does not relieve the transferor of his liability for assessment, if made within four months prior to its closing?

Was the transfer of 100 shares of stock by defendant, Hartwick estate, made with the fraudulent intent of avoiding its liability as a stockholder?

Appellant supports its first question with a most interesting and persuasive argument for a different interpretation of the four-months' rule than the one evidently applied by the trial court.

Appellee says the question of interpretation was not raised at the trial. The bill of complaint, how-

ever, states the proposition and appellant builds its case around the problem. We feel it is better to consider and decide this question.

Section 12024, 3 Comp. Laws 1929, reads in part:

"The stockholders of every trust company shall be individually liable, equally and ratably, and not one for another, for the benefit of the creditors of said trust company to the amount of their stock at the par value thereof, in addition to the said stock."

An assessment was levied in this receivership and sustained in *Detroit Trust Co.* v. *Allinger,* 271 Mich. 600. See, also, *Gauss* v. *Detroit Trust Co.,* 297 U. S. 695 (56 Sup. Ct. 572), where a writ of error issued in this cause was dismissed in the United States supreme court.

Section 12005, reads in part:

"All sales, transfers, and assignments of any stock made or given with the intent and purpose on the part of such stockholder to hinder, delay, or defraud the creditors of such company or any of them shall be null and void as against the creditors of such company, except as to purchasers in good faith and for present fair consideration, if made within four months prior to the filing of a petition asking for the appointment of a receiver of such company."

The quoted portion of the foregoing section was first incorporated in the trust company act, as part of Act No. 67, Pub. Acts 1929 and similar language appeared as an amendment to the banking act (Act No. 46, Pub. Acts 1927 [3 Comp. Laws 1929, § 11906]).

The law prior to the 1927 amendment and the 1929 enactment is stated in *Foster* v. *Row,* 120 Mich. 1 (77 Am. St. Rep. 565). It is suggested by the appellee in a companion case, *Detroit Trust Co.* v.

*Granger, post,* 152, that *Foster* v. *Row,* is controlling on this question.

Appellant in the instant case, in discussing the four-months' rule, says:

"At first blush, it might appear that this clause limits the liability for fraudulent transfers only to the period of four months prior to receivership. This would mean that while, prior to the act, a fraudulent transfer five months prior to receivership would not relieve the transferor of liability, yet, subsequent to its enactment, such fraudulent transfer would relieve the transferor of liability. This would mean that the Michigan legislature sought by this act to protect fraudulent transfers after the lapse of a four-month period. That such an interpretation of this statute would contravene the well-recognized principles of public policy abhorring fraudulent conduct there can be no doubt. Nor should such interpretation be given to the legislative intent except for the absence of any possible construction along lines consistent with established public policy."

Prior to 1927 there was nothing in either the banking or trust company acts that specifically said that a transfer of stock made with intent to avoid an assessment was invalid.

The question resolves itself into this: Did the legislature by its enactment of 1929 intend to increase or diminish the liabilities of stockholders in trust corporations? No records of committee reports or legislative debates are available as aids in a search for the correct answer. The holdings of Federal and other appellate courts are at best only persuasive because they deal with banking statutes containing varying provisions.

Appellant argues that the statute in its present form does not express the true intent of the legisla-

ture and that its meaning may be made clear if the word "or" is interpolated in the present arrangement. It is also suggested that the statute may be clarified by a transposition of its language. The construction sought is either:

"All sales, etc., shall be null and void as against the creditors of such company, except as to purchasers in good faith and for present fair consideration *or* if made within four months prior to the filing of a petition," etc., (the italics indicating the interpolation)

or

"All sales, transfers, and assignments of any stock made or given with the intent and purpose on the part of such stockholder to hinder, delay or defraud the creditors of such company or any of them, if made within four months prior to the filing of a petition asking for the appointment of a receiver of such company, *shall be null and void as against the creditors of such company except as to purchasers in good faith and for present fair consideration.*" (The italics indicating the transposition.)

*People* v. *Cain,* 171 Mich. 279, and *City of Grand Rapids* v. *Crocker,* 219 Mich. 178, are cited as authority for the interpolation and *City of Detroit* v. *Chaffee,* 70 Mich. 80, for transposition.

In the *Cain Case,* it was necessary to read the word "or" into a wholesale liquor dealers' statute (Act No. 170, § 2, Pub. Acts 1911) in order to give the section complete sense and meaning. The word "or" was obviously inadvertently omitted. The case of *City of Grand Rapids* v. *Crocker, supra,* 184, held that "the intention of an act will prevail over the literal sense of its terms."

The primary rule governing the interpretation of statutes is to ascertain and give effect to the inten-

tion of the legislature. The court said in *City of Grand Rapids* v. *Crocker, supra,* 182:

"All others serve but as guides to assist the courts in determining such intent with a greater degree of certainty. If the language employed in a statute is plain, certain and unambiguous, a bare reading suffices and no interpretation is necessary. The rule is no less elementary that effect must be given, if possible, to every word, sentence and section. To that end, the entire act must be read and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole."

*City of Detroit* v. *Chaffee, supra,* 87, holds that:

"It will not do to give the statute such a strict construction as to make it meaningless. In order to give effect to a statute, courts will sometimes transpose sentences, so as to place them in their just connection with the context to which they relate."

The statute in question, if read as written, is plain, certain and unambiguous without the addition of the word "or" and is not meaningless if read without transposition of its sentences.

Had the legislature intended that all transfers of stock made within four months preceding a receivership would, *per se,* not avoid the transferors' liability for stock assessments, it would and should have written the quoted part of the section as suggested by appellant.

Courts are sometimes facetiously charged with indulging in judicial legislation, but they should not assume to exercise this doubtful prerogative, nor should they be concerned with policies of legislation

so long as they do not transgress constitutional limitations.

We are unable to agree with appellant's premise that "any transfer of the stock of a trust company made within four months prior to receivership of such company is void as against creditors of a trust company and does not relieve the transferor of his liability for assessment." Nor can we arrive at this conclusion in this case except by an unwarranted interpolation or transposition of words. The authorities heretofore cited do not authorize such action under the facts presented.

In this connection, see the companion cases of *Detroit Trust Co.* v. *Granger, post,* 152, and *Detroit Trust Co.* v. *Hockett, ante,* 124.

The trial judge did not discuss appellant's first question in his written opinion; an answer to it was essential to decision. It must be assumed from the decree that it was answered in the negative and we are in accord with that answer.

We have heretofore quoted at length from the circuit judge's views on the question of fraudulent intent. This is an appeal in chancery and a trial *de novo.* We have therefore examined the testimony and weighed the evidence.

We are strongly impressed that the real purpose behind the transfer was to avoid the anticipated stockholders' assessment.

At the time of the transfer, the Guaranty Trust Company itself was acting as one of the three testamentary trustees. An inventory of the Hartwick estate filed May 12, 1919, shows 50 shares of Guaranty Trust Company stock valued at $6,000. This same stock, to which 50 shares had been added later, is shown in the twelfth annual account filed July 31, 1930, and its value is given as par, $10,000,

inventory valuation, $13,500. (Stock was sold to old stockholders when the trust company was reorganized in 1926 at $150 a share.) These 100 shares were sold by the trustees in 1931 for $.45 a share and all three trustees indorsed the stock certificate, the trust company's signature being affixed by its secretary and treasurer. The ostensible purchaser, Robah G. Hoover, was at the time doing some work in the office of Hartwick Properties, Inc. At the trial, he could not produce the check which he gave for the stock. The certificate was transferred the same day of the claimed sale and someone requested that the new certificate be issued in the name of Mary A. Hoover, which was done. Hoover later listed the assessment on this stock in his bankruptcy schedule stating it was in fact owned by him. Mrs. Hartwick sold 44 shares of her own trust company stock to Hoover on the same day and in the same manner, but this certificate was returned to her later by Hoover upon her request, through Austin, the manager of the Hartwick companies. At the time, Hoover was indebted to Mrs. Hartwick in rather large amounts and both Hoover and his wife were insolvent when the stock was transferred. Hoover says he paid $45 for the stock to Edward N. Hartwick but the record contains a receipt given to the trust company for the new certificate and signed by Hartwick.

Guaranty Trust Company stock sold for $10 a share before it was taken off the exchange, and when the 100 shares were transferred, the same stock was being purchased by brokers for witness Anhut on ''standing orders'' at from $3 to $5 a share. No dividends had been paid on the stock for about one year.

Mrs. Hartwick was the dominating and active manager of the trust estate and to attribute to her such an abysmal ignorance of the realities of the situation as is contained in the opinion of the trial judge imposes considerable strain upon one's credulity.

The trial judge indicated that he could not draw reasonable, natural and ordinary inferences from well established facts. This is not the law. See *Ginsberg* v. *Burroughs Adding Machine Co.,* 204 Mich. 130; *Standard Drug Store* v. *A. E. Wood & Co.,* 227 Mich. 333; *Johns* v. *Wisconsin Land & Lumber Co.,* 268 Mich. 675, and *Glenn* v. *McDonald Dairy Co.,* 270 Mich. 346. It is the province of the trial judge in a non-jury case, to draw legitimate inferences from the established facts and to weigh the probabilities from such established facts. *Ginsberg* v. *Burroughs Adding Machine Co., supra.*

*Foster* v. *Row, supra,* required plaintiff to sustain the burden of showing that the transfer was made for the fraudulent purpose of avoiding liability as a stockholder. That opinion says, pp. 25, 27:

"The cases all seem to hold that the intent to avoid liability is a material element in determining the liability of one who has transferred his stock while the corporation was a going one. * * * The courts of England hold that the shareholder is not liable where he has made an out and out transfer, and do not consider the motive; holding, however, that where the transfer is merely colorable, or to a mere dummy, the shareholder retains such an interest as makes him liable. The courts of this country have, as already shown, gone further, and hold the transferor liable when they find an intent to escape the statutory liability."

Intent is a mental condition and is determined not so much by what one says as it is by what one does.

"Fraud need not be shown by direct proof, and may be, and generally is, proven by inference from facts and circumstances." *Henneberger v. Matter,* 88 Mich. 396, 407.

The reasonable, natural and ordinary inferences from the established facts in the record do not permit agreement with the conclusions of the trial judge.

In our opinion defendants should not be relieved from liability for the stockholders' assessment on the 100 shares of stock. It has been transferred for the fraudulent purpose of avoiding the anticipated assessment liability.

The decree of the lower court is reversed and one will be entered here for the full amount of that assessment and interest thereon, with costs to appellant.

NORTH, C. J., and FEAD, WIEST, BUTZEL, SHARPE and TOY, JJ., concurred. POTTER, J., did not sit.