SMACY *v.* AUSTIN.

1. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW—REC-
   ORD.
   The Supreme Court hears a chancery case *de novo* on the record
   made in the trial court, not on evidence newly introduced.

2. SAME—CHANCERY CASES—EVIDENCE.
   The Supreme Court on appeal in a chancery case has the duty
   to weigh all the evidence and reach independent conclusion, if
   the facts are in dispute, in accordance with the just rights of
   the parties.

3. SAME—CHANCERY CASES—SUPREME COURT—EVIDENCE.
   The Supreme Court is not relieved of the duty of exercising its
   own judgment in passing on the evidence in a chancery case
   merely because the trial judge had the advantage of seeing
   and hearing the witnesses when their testimony was given.

4. EVIDENCE—INFERENCES—NONJURY CASES.
   It is the province of the trial judge in a nonjury case, to draw
   legitimate inferences from the established facts and to weigh
   the probabilities from such established facts.

5. HUSBAND AND WIFE—SEPARATE PROPERTY—EVIDENCE.
   Plaintiff widow whose uncontradicted testimony showed she had
   $12,000 in cash in a safe deposit box that was not otherwise
   used or removed than by her second husband when he bought
   stocks with such cash *held,* entitled, as her separate property,
   to proceeds from the sale of such stocks which were sold by
   the administrator of his estate, there being no showing dece-
   dent had any cash in the jointly rented box.

Appeal from Ingham; Salmon (Marvin J.), J.
Submitted June 5, 1963.  (Calendar No. 14, Docket
No. 49,985.)  Decided September 4, 1963.

REFERENCES FOR POINTS IN HEADNOTES
[1–3]  5 Am Jur 2d, Appeal and Error §§ 703, 822.
[4]  53 Am Jur, Trial § 1123.
[5]  26 Am Jur, Husband and Wife §§ 91, 92.

Bill by Frances Smacy against William A. Austin, administrator with the will annexed of the estate of Joseph W. Smacy, deceased, to obtain return of funds taken from safety deposit box by decedent for purchase of stocks. Bill dismissed. Plaintiff appeals. Reversed and remanded.

*Milton G. Schancupp,* for plaintiff.

*Henry Clay Campbell,* for defendant.

O'HARA, J. Plaintiff-appellant, Frances Smacy, is a Czechoslovakian emigrant, as was her deceased first husband. Her second husband also deceased, and whose administrator is defendant-appellee herein, was also a Czechoslovakian.

Over a long period of years Mrs. Smacy, the plaintiff, while married to her now deceased first husband, operated with him a summer resort. They realized a profit of some $2,000 to $2,500 per year. After her first husband's death she continued to operate the resort at a somewhat reduced profit. In 1957, she sold the property for $15,000. Of this some $7,000 was in cash which plaintiff, in the manner not uncharacteristic of unassimilated emigrants —the language of her home life in both marriages was her native tongue—kept in a "little box" at home. She spent none of the money, lent none, made no gifts thereof or therefrom. She added thereto $5,000 in accumulated savings. At some indeterminate time during her second marriage, and under circumstances not at all clear from the record —small wonder in view of the language difficulty encountered on hearing—the money was supposed to have been put in a safe deposit box maintained at a Lansing bank in her own and her second husband's joint names. Upon her second husband's death she went to the bank with her sister-in-law,

and without the formality of notification to the county treasurer, opened the box with her key. Instead of her expected $12,000, which she contended was in a light brown envelope, she found $1,300 in cash. There was also what she described as "just a ticket" in response to a question whether there was or were a share or shares of stock in the box. The $1,300 in cash she turned over to her husband's daughter (apparently by a prior marriage) because she thought the daughter was the administrator of her late husband's estate.

All of the foregoing was elicited from plaintiff on painful direct examination by her counsel who threaded a perilous passage past the reef of the deadman's statute,[1] and who gallantly posed a question and then instructed his client not to answer until the court could rule on the anticipated objection.

To the foregoing was added the testimony of Albert P. Hafner, a part-time security salesman, associated also with Michigan State University, a compressed version of which here follows. In response to a direct mail investment solicitation, Mr. Hafner went to the Smacy home. The deceased indicated an interest in buying some preferred stock; Texas Eastern Transmission Corporation was the issue agreed upon. Arrangements were made to consummate the transaction at the American State Bank in Lansing—the bank where the Smacys rented the safe deposit box. The salesman asked deceased how he would like to have the stock issued and suggested a joint tenancy with a right of survivorship. Decedent said he would like to have it in his

---

[1] CL 1948, § 617.65 (Stat Ann § 27.914). "Sec. 65. When a suit or proceeding is * * * defended by the * * * personal representatives of a deceased person, the opposite party, if examined as a witness in his own behalf, shall not be admitted to testify at all to matters which, if true must have been equally within the knowledge of such deceased person."

own name—that his wife "would be taken care of." The purchase date and time was fixed at around 11 a.m., March 2, 1960. Mr. Hafner waited at the bank and decedent arrived shortly before 12 o'clock noon, the closing hour of the bank. Deceased then required Mr. Hafner to go to his (deceased's) car parked on Michigan avenue. At the car he gave to the salesman $5,000 in 50- and 1,000-dollar[2] bills. Deceased told Mr. Hafner the money was part of the proceeds *"his wife* had in their joint savings account or lock box." Mr. Hafner raised no question because at the meeting at the Smacy home when the purchase was first discussed, decedent mentioned buying the stock in his own name, and Mrs. Smacy, who was present, voiced no comment.

After a follow-up call at the Smacy home, a second purchase meeting was arranged at the same bank. On this occasion deceased met Mr. Hafner in the hallway of the bank and delivered to him $5,000 in cash in 50- and 100-dollar bills for which he purchased preferred stock—as previously agreed upon—in the Upper Peninsula Power Company, again in his own name. Again, in the words of the competent witness Hafner, deceased said, "that *it* was, part of the money was his wife's." The net purchase price of the Texas company stock was $4,935; the Power Company stock $4,980. Delivery of the stock was in each instance made to Mr. Smacy by first-class mail with the usual customer receipt requested and executed by him.

After Mrs. Smacy discovered her money was not in the envelope in the box, she brought this equitable action, praying that $8,000 of proceeds of the sale of the stock by decedent husband's administrator be decreed her sole property. This figure in the prayer was apparently reached by reason of an

---

[2] The record supports the inference that *1,000*-dollar bills is a misprint intended to be *100*-dollar bills.

alleged admission by decedent that he had used $8,000 of her money and purchased stock with it. Testimony to support this allegation was not offered and forms no part of the record here.   Defendant offered no testimony, chose not to cross-examine plaintiff and limited its participation to brief cross-examination of Mr. Hafner, the basic thrust of which was that Mrs. Smacy was present at the discussion between the security salesman and deceased—that she was in a position to hear it and made no objection to the proposed purchase in deceased's name alone. A gratuitous but no doubt well-intended statement by the witness Hafner that he didn't think Mrs. Smacy understood the conversation or the arrangement was properly stricken.

At the conclusion of the hearing, the chancellor delivered his opinion from the bench, and from which we quote:

*"The Court:* Well, gentlemen, by virtue of this statute, the deadman's statute, so-called, matters equally within the knowledge of the deceased, these cases are most difficult to decide, but the statute, or, rather, I should say the decedent here, of course, is not with us to testify and we don't know the facts from his standpoint.  We don't know the conversations he may have had with his wife and his mouth being sealed on this matter, hers is likewise by virtue of this statute, and to here say that you have established your case, Mr. Schancupp, by a preponderance of the evidence in my opinion does not carry justification in the record.

"I am sure that perhaps this statute on many occasions has caused unfairness and some perhaps, inequitable decisions, but nonetheless it is there and we have to abide by it."

We are constrained to disagree with the able chancellor, specifically in his finding that "there may be some inference there" (in the record).   Hearing as

we do the case *de novo*,[3] we believe the reasonable—in fact, the only possible inference from the testimony—mandates the conclusion that the cash used to purchase the stocks was the sole property of plaintiff. This conclusion is not based only on inference from the testimony adduced. The only direct testimony in the record is that of the competent witness Hafner that decedent said in connection with the first transaction, that the money was part of the proceeds "his wife had in their joint savings account or lock box." As to the second transaction, the witness' testimony was: "He said that it was, part of the money was his wife's."

The foregoing testimony is uncontradicted and unchallenged on the record. There is no suggestion that the witness Hafner's credibility was questioned. No indication of any interest on his part in the outcome of the litigation was made. The opinion of the court makes no mention of a rejection of the testimony for any reason of interest or lack of credibility. Uncontradicted and unchallenged with no question of credibility raised, it at least makes out the plaintiff's prima facie case on the question of whose funds were used for the stock purchases.

Under these circumstances, we cannot agree that for the trial court to say plaintiff is entitled to the proceeds of the stock sale would amount to "deciding the matter pretty much on guess work." In *Detroit*

---

[3] "Hundreds of times the Supreme Court has stated that it hears and considers chancery cases *de novo* on appeal. This means that the hearing is *de novo* on the record made in the trial court. It does not mean a trial on evidence newly introduced. It means that the Supreme Court has the duty to weigh all the evidence and reach an independent conclusion, if the facts are in dispute, in accordance with the just rights of the parties. The Supreme Court is not relieved of the duty of exercising its own judgment in passing on the evidence merely because the trial judge had the advantage of seeing and hearing the witnesses when their testimony was given." 8 Callaghan, Michigan Pleading and Practice, Scope of Appellate Review, § 57.96; Same, 1963 Cum Supp; and see *Christine Building Co.* v. *City of Troy*, 367 Mich 508 at 517, and cases there cited.

*Trust Co.* v. *Hartwick,* 278 Mich 139, we said, at p 151:

"It is the province of the trial judge in a nonjury case, to draw legitimate inferences from the established facts and to weigh the probabilities from such established facts."

In *Sullivan* v. *Detroit & W. Ferry Co.,* 255 Mich 575, 579, we went further and held:

"The trial court was bound to give consideration not only to the testimony of the witnesses but to make use of all reasonable and ordinary deductions from the established facts."

Absent any showing to controvert plaintiff's testimony that she had $12,000 in cash in the safe deposit box; that it was not otherwise used or removed; no showing that decedent had any cash in the jointly rented box; that the stocks were purchased for cash from funds taken from the box, we fail to see what inference other than that the cash was plaintiff's could be drawn from the uncontradicted and unchallenged testimony.

The amount of plaintiff's funds used in the stock purchase, we believe, is likewise ascertainable on the basis of the testimony and the legitimate inferences therefrom.

Plaintiff testified there was $12,000 in cash of her money in an envelope in the deposit box. This was not disputed. The witness Hafner testified that $10,000 in cash was delivered to him by decedent for the stock, which cash decedent candidly admitted he took from the box. There was $1,300 in cash left in the box when plaintiff went to the bank immediately after her husband's death. This latter sum she turned over to the person she mistakenly believed to be the administrator of her deceased husband's estate because the cash was not in the envelope in

which her funds had been kept. This fact bespeaks admirable honesty and candor. We believe it well within the range of the reasonable inference from the uncontradicted testimony that the entire purchase price of the stocks was plaintiff's. It is to be remembered that the amount between the two $5,000 cash payments and the purchase prices of $4,935 and $4,980 was repaid to decedent by Mr. Hafner's check.

There is no testimony in the record of the value of the stock at the date of decedent's death. The administrator testified that the net proceeds of the sale of the stock was $9,413.65. No suggestion is made that such net was not the maximum realizable value on the date the administrator sold it. As closely as it is possible, under the facts of and inferences from the record before us, to trace and segregate plaintiff's funds, the converted cash value of the securities sold represents her reimbursable interest.

For the reasons herein set forth, the decree of the trial court dismissing plaintiff's bill of complaint is vacated. The case is remanded, with instructions to enter a decree ordering the payment by the administrator of the proceeds of the sale of the involved stock to plaintiff. Appellant may have costs.

CARR, C. J., and DETHMERS, KELLY, BLACK, KAVANAGH, SOURIS, and SMITH, JJ., concurred.