**AMERICAN CUSTOMS BROKERAGE CO., INC., A/C Astral Corp.**

v.

**UNITED STATES.**

**C.D. 4546; Court No. 72-2-00308.**

United States Customs Court.

May 30, 1974.

Glad, Tuttle & White, Los Angeles, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (James Caffentzis, New York City, trial atty.), for defendant.

RE, Judge:

The question presented in this case pertains to the dutiable status of a yacht under the Tariff Schedules of the United States (TSUS). The yacht, the "MS Astral," is registered and documented under the laws of the Netherlands Antilles, and was brought into the United States by a resident of this country.

The Astral first entered the territorial waters of the United States at San Diego Harbor on or about November 23, 1970. On November 24, 1970, the yacht's master, Captain Perdue, pursuant to 46 U.S.C. § 104 and section 4.94 of the Customs Regulations, applied for and obtained a cruising license to cruise in and around the waters of San Diego, Los Angeles, San Francisco, Seattle and Honolulu until May 24, 1971. In March 1971, the Astral departed from California for Hawaii, where a 6 months' extension of the cruising permit was issued on May 20, 1971.

However, at the insistence of customs officials, an appraisement entry of the yacht was made on June 30, 1971 at Honolulu, Hawaii. The Astral was thereupon classified under TSUS item 696.10, as modified by T.D. 68–9, as a yacht or pleasure boat valued over $15,000, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof. Hence, it was assessed with duty at the rate of 6 per centum ad valorem.

Plaintiff contends that the yacht was not subject to entry under the customs laws and was therefore nondutiable under either of the following grounds: (1) since there was no intent to bring the Astral into the United States permanently, it was a nonimportation, or (2) since it was owned by a nonresident, it was not imported for charter or sale to a resident of the United States.

The pertinent statutory provisions read as follows:

Tariff Schedules of the United States
General Headnotes and Rules of
Interpretation
"1. *Tariff Treatment of Imported Articles.* All articles imported into the customs territory of the United States from outside thereof are subject to duty or exempt therefrom as prescribed in general headnote 3.

\* \* \* \* \* \*

3. *Rates of Duty.* The rates of duty in the 'Rates of Duty' columns numbered 1 and 2 of the schedules apply to articles imported into the customs territory of the United States as hereinafter provided in this headnote:

\* \* \* \* \* \*

5. *Intangibles.* For the purposes of headnote 1—

\* \* \* \* \* \*

(e) vessels which are not 'yachts or pleasure boats' within the purview of subpart D, part 6, of schedule 6,

are not articles subject to the provisions of these schedules."

Schedule 6, part 6, subpart D:

"*Subpart D headnote:*

1. This subpart does not cover—

(i) yachts or pleasure boats provided for in items 696.05–.10 if in use or intended to be used in trade or commerce, or if brought into the United States by non-residents thereof for their own use in pleasure cruising; or

(ii) vessels which are not yachts or pleasure boats (see general headnote 5(e)).

---

Yachts or pleasure boats, regardless of length or tonnage, whether motor, sail, or steam propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yachts or boats are brought into the United States under their own power; and parts thereof:

Yachts or pleasure boats:

\* \* \* \* \* \*

696.10 Valued over $15,000
each . . . . . . . 6% ad val."

46 U.S.C. § 104:

"Reciprocal exemption of foreign yachts from charges and tonnage taxes; licenses.

Whenever it shall be made to appear to the satisfaction of the President of the United States that yachts used and employed exclusively as pleasure vessels and belonging to any resident of the United States are allowed to arrive at and depart from any foreign port and to cruise in the waters of such port without entering or clearing at the customhouse thereof and without the payment of any charges for entering or clearing, dues, duty per ton, tonnage taxes or charges for cruising licenses, the Commissioner of Customs may authorize and direct the customs authorities at the various ports of entry of the United States to allow yachts from such foreign port used and employed exclusively as pleasure vessels to arrive at and depart from any port of the United States and to cruise in waters of the United States without the payment of any charges for entering or clearing, dues, duty per ton, or tonnage taxes, but the Commissioner of Customs may, in his discretion, direct that such foreign yachts shall be required to obtain licenses to cruise, in a form prescribed by him, before they shall be allowed under the provisions of this section to cruise in waters of the United States. Such licenses shall be issued without cost to such yachts and shall prescribe such limitations as to length of time, direction, and place of cruising and action, and such other particulars as the Commissioner of Customs may deem proper."

At the trial, two witnesses testified for plaintiff: Mr. Cornelius Christian Vanderstar, a naturalized citizen of the United States and resident of Newport Beach, California, and Harry William Perdue, a retired Coast Guard lieutenant commander, who was hired as master of the Astral from approximately October 10, 1970 until May 30, 1971.

Mr. Vanderstar testified that the Astral is a 98-foot steel hull, ketch rigged motor sailer, which was built for him by a West German shipyard. He stated that he paid approximately $650,000 for the yacht upon its completion in July 1970.

Prior thereto, in April 1970, Mr. Vanderstar organized the Astral Corporation in Curacao, Netherlands Antilles, through two Dutch companies and their representatives. The purpose of the Astral Corporation, as stated in its articles of incorporation, was the "operation of one or more seagoing yachts and everything connected therewith in the broadest sense." After forming the company, the incorporators sold all of their shares to Mr. Vanderstar, who thereby became the sole stockholder.

In July 1970, before the yacht was completed, the Astral Corporation purchased the Astral from Mr. Vanderstar, who loaned the corporation approximately $688,000 so that it could buy the yacht from him. The yacht was subsequently registered at Curacao.

Commencing with the last half of 1970, and in 1971 and 1972, Mr. Vanderstar personally chartered the yacht for an annual fee of $140,000. Part of the chartering fee was to pay the boat's operating expenses, such as fuel, food, wages, upkeep and repairs, all of which were personally paid by Vanderstar. The balance was applied toward the repayment of the loan.

In July 1970, the Astral sailed from West Germany to Holland on the start of its "shakedown" cruise. A "shakedown" cruise is intended to test a new ship under operating conditions, and to familiarize the crew. As explained by the witness:

"Every new boat needs a certain amount of time to sort of see how everything operates at sea, whether there were any bugs in the equipment or, if changes had to be made, to get everything operating properly."

Having owned only much smaller yachts, Mr. Vanderstar did not know the duration of a "shakedown" cruise for a yacht the size of the Astral. Furthermore, the Astral was already encountering some problems in the electrical system when he acquired it in Germany, and the builder sent an engineer with him to Holland to correct some of the difficulties.

The yacht proceeded from Holland to England and thence to the Canary Islands, taking about one and a half months. It then proceeded to Curacao, taking another one and a half to two months. It was delayed about four weeks in Curacao because the entire air conditioning system was inoperative and a number of motors had to be rewired and changed. Finally, it went through the Panama Canal up the Mexican coast to Acapulco, where one of the diesel generators was completely overhauled and new pistons and cylinder linings were installed. The motor, however, still did not work properly. Although the generators were under warranty by the General Motors Corporation, that company did not have a representative in Acapulco.

Mr. Vanderstar then had the Astral proceed north to San Diego to "obtain a cruising permit in order to spend some time in the United States and, among other things, to have some repairs made to the boat."

The yacht remained two nights in San Diego, and then proceeded to Mr. Vanderstar's residence at Newport Beach where it was docked. Repairs were made at Newport Beach, and at the Lido Shipyard, by the crew, the shipyard, and representatives from various companies. The repairs consisted of a complete overhaul of both diesel generators, installation of new through-hull fittings to relieve the extensive exhaust pressure in the exhaust system, and installation of new piping and valves to lead the water overboard rather than through the exhaust. New piping valves and overboard fittings were also installed for the main engines to relieve some of the exhaust pressure out of the exhaust system. Additionally, in view of certain difficulties, new water filters were put into the diesel system in order to be able to observe the water in the systems.

Other repairs also had to be made. The rectangular port holes were rebuilt because they were leaking water inside instead of outside, an air-conditioning compressor was replaced as it had a broken shaft, and various repairs were

made on the refrigerator and freezer system. The a. c. inverter, which never worked properly despite repairs in three ports, had to be taken completely apart. Because of a design defect, the parts were shipped back to the Chicago manufacturer where they were redesigned, rebuilt, returned to Los Angeles and reinstalled.

The outside of the hull had to be completely stripped of all the paint and putty-finish put on in Germany because the paint was peeling away and causing corrosion of the hull. The outside of the hull had to be completely refinished by the Lido Shipyard, a process which took almost two months, required the yacht to be drydocked, and cost Mr. Vanderstar in excess of $16,000.

A leaking hot-water tank that had been unsuccessfully welded in Mexico was rewelded in Los Angeles. This same tank later blew out on the cruise to Hawaii, and was repaired there at a cost of $400. Also, the toilets were replaced, the captain's cabin was rebuilt to add an extra bunk to carry a crew of six instead of five, carpeting and upholstery were replaced, and a VHF radio was installed. The cost of the work done on the hull at Lido Shipyard, together with the cost of the repairs done in Newport Beach, exceeded $30,000.

The yacht was moored at Mr. Vanderstar's residence from November 1970 to January 1971, and again for a few weeks in March. In March it made a few trial runs to Catalina Island and outside the harbor in order to test the motors, and to have the personnel from General Motors Diesel Works adjust the engines.

The yacht left California in late March of 1971, and arrived at Hawaii on Easter Sunday. The purpose of the Hawaiian trip was to "try out all the various items that we had on board and to see how everything was working and part of the general shakedown cruise." The yacht was used for cruising in Hawaii "running from island to island." However, although there were some guests on board, they were "still trying out the boat in various ways and still had some breakdowns in Hawaii." According to Mr. Vanderstar, "the repairs took practically all the time that the boat was here" [in the United States].

The Astral left Hawaii in June 1971, arriving in Tahiti round August. From there, it went back through the Panama Canal to the Caribbean, crossed the Atlantic reaching northern Europe in June of 1972, and proceeded to the Mediterranean. The last repairs were made in August 1972 at the West German shipyard where the Astral was built.

Mr. Vanderstar did not stay with the Astral during the entire cruise. He remained on the yacht until it arrived at the Canaries, disembarked, and then rejoined it for certain periods of time at various ports. When on board he was accompanied at times by his wife, friends, and by a cameraman on the trip from England to Curacao.

He testified that he never intended to bring the yacht into the territorial limits of the United States as an importation; that he intended "to stay a maximum of two months, and it dragged on and on because of the larger repairs that had to be made," and that it "would have been impossible" to have the repairs done elsewhere than in the United States because there were "no services available on these items with the degree of malfunction that existed in them." He had planned to "make an extended cruise while shaking down the boat" and to have the yacht end up in the Mediterranean where it would be made ready for charter purposes.

The Astral has two gangplanks, a stern gangway that is used for Mediterranean mooring, and another, which is used in the United States, for exiting from the side. The vessel is also equipped for 220 volt a. c. shore power, the current used in Europe, and for 110 a. c. power, which is used in this country. It has a shallow draft and a retractable center board so that it can be sailed in the waters of the Bahamas and

Caribbean. It is equipped for long cruising, having a large water and fuel capacity, large refrigeration and freezer storage units, and a fresh water making unit.

Captain Perdue testified that when he was interviewed for the job as master, Mr. Vanderstar told him that he intended to get the boat in shape; that he was having problems with it and the crew; that it was breaking down; and that he wanted to take it on a shakedown cruise. Mr. Vanderstar also told him that he planned to go from "the Caribbean to Mexico, for awhile the United States, down over to Tahiti, back to the Caribbean, and then to Europe." According to Captain Perdue, all of his discussions with Mr. Vanderstar indicated that the vessel "would never come to the United States to stay, but only for a visit, as any yacht would visit any place in the world."

When Captain Perdue came on board in Curacao, the air-conditioning system was undergoing extensive repairs and some work was being done on the engines. There were air-conditioning problems at every stop.

During its entire stay in the United States, the yacht was always under repair except for a few days. Captain Perdue stated that he took it out about three times when it was at Newport Beach, either as a work trip or to test it. The Astral also had breakdowns on the way to Hawaii. Furthermore, some of the repairs made in Newport Beach did not hold up and had to be done over. He observed that a shakedown cruise for any vessel can last for a long period of time. In the case of the Astral, the main problems were the quality of the technical work on it and getting service on the warranties.

Upon entering the territorial waters of the United States, Captain Perdue first called at San Diego where he notified customs, immigration and public health officials. He had applied for the crusing permits in San Diego and Hawaii because the Astral, in his words,

"was a foreign vessel entering the United States and it was going to stay for awhile. It was a yacht, and the law requires it."

■ In having classified the Astral under item 696.10 of the tariff schedules, and having assessed duty thereunder the appropriate customs officials must have found that: (1) it was "imported into the customs territory of the United States" within the meaning of TSUS general headnote 1; and (2) that it was a yacht or pleasure boat owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof. Those determinations are endowed with a statutory presumption of correctness. 28 U.S.C. § 2635(a) (1970). See Sanji Kobata et al. v. United States, 326 F.Supp. 1397, 1399, 66 Cust.Ct. 341, 344, C.D. 4213 (1971).

Accordingly, in order to prevail in this litigation it is plaintiff's burden to establish either that the Astral was not "imported" into the United States, in the tariff sense, or, that even if it were an "importation," it did not come within the ambit of item 696.10, and was therefore exempt from duty by virtue of TSUS general headnote 5.

Plaintiff challenges the action of the customs officials on both grounds, contending that the boat was not "imported into the customs territory of the United States," and that it was owned by a nonresident corporation which did not bring it into the United States for sale or charter to anyone.

Based upon all of the evidence of record, and particularly the testimony of plaintiff's witnesses, it is the determination of the court that plaintiff has successfully borne its burden of proof in establishing that the Astral was not an "importation" for tariff purposes, and was, therefore, improperly assessed for duty. Hence, it is unnecessary to reach the question raised as to the appropriateness of its classification under item 696.10 of the tariff schedules.

What constitutes an "importation" under the tariff laws of the United States has already been the subject of judicial consideration. Unless it clearly appears that Congress intended otherwise, the term "importation" has been held to mean the bringing of goods within the jurisdictional limits of the United States with intent to unlade. The Sherwin-Williams Co. v. United States, 38 CCPA 13, C.A.D. 432 (1950); Porto Rico Brokerage Co., Inc., et al. v. United States, 23 CCPA 16, 76 F.2d 605, T.D. 47672 (1935), aff'd on rehearing, 23 CCPA 259, 80 F.2d 521, T.D. 48111 (1936); United States v. Field & Co., 14 Ct. Cust.Appls. 406, T.D. 42052 (1927); United States v. Estate of Boshell, 14 Ct.Cust.Appls. 273, T.D. 41884 (1926). The foregoing definition, of course, cannot be applied literally in the case of a seagoing vessel or yacht entering the United States under its own power. As stated by the Court of Customs and Patent Appeals, in considering the applicability of paragraph 370 of the Tariff Act of 1930,[1] the predecessor tariff provision to item 696.10:

"* * * it is evident * * * that such an entry may amount to an importation under that paragraph. It is therefore necessary to determine under what circumstances the act of bringing a yacht into the United States under its own power constitutes an importation.

"The appellant cites a ruling of the Treasury Department, reported in 33 T.D. 292, T.D. 37376 as giving the proper definition of importation of a vessel. That ruling states that:

'If coming into this country temporarily as carriers of passengers or merchandise, they are not subject to customs entry or the payment of duty, but if brought into the United States permanently they are to be considered and treated as imported merchandise.'

"Assuming that definition to be correct, it is evident that the word 'permanently,' in the case of a seagoing vessel would not preclude the use of the vessel for cruises abroad after its importation. It is also evident that the question as to whether a vessel is brought into the United States 'permanently' must be determined on the basis of intent." Estate of Lev H. Prichard v. United States, 43 CCPA 85, 87–88, C.A.D. 612 (1956).

■ As gleaned from the *Prichard* case, a determination as to whether a yacht is "imported," at least for purposes of paragraph 370, turns ultimately on the question of intent.

The legislative history of item 696.10 of the tariff schedules, as contained in the Tariff Classification Study, November 15, 1960, indicates that it was designed to carry over the provisions of paragraph 370 into the revised tariff schedules (TSUS).[2] Hence, the reasoning of the *Prichard* case, with which the court is in full accord, may serve as a guide in the decision of the present case.

Intent is a state of mind which is difficult of precise proof and can only be

[1]. Par. 370 provided as follows:
"Airplanes, hydroplanes, motor boats, and parts of the foregoing, 30 per centum ad valorem. The term 'motor boat,' when used in this Act, includes a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam, or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include a yacht or boat used or intended to be used in trade or commerce, nor a yacht or boat built, for the building of which a contract was entered into, prior to December 1, 1927."

[2]. The Study, schedule 6, part 6, states at page 327:
"Items 696.05 through 696.15 reflect the existing treatment of yachts or pleasure boats and parts thereof under paragraph 370. Paragraph 370 in defining the term 'motor boats' provides that the term does not include 'a yacht or boat built, or for the building of which a contract was entered into, prior to December 1, 1927'. This provision has been dropped as obsolete."

inferred from acts and circumstances. See United States v. Stoehr, 100 F.Supp. 143 (M.D.Pa.1951); Jones v. State, 192 So.2d 285 (Fla.App.1966). A person's intent is usually evidenced by his conduct or statements. See Johnson v. Commonwealth, 209 Va. 291, 163 S.E.2d 570 (1968); Detroit Trust Co. v. Hartwick, 278 Mich. 139, 270 N.W. 249 (1936). Expressions of intent, however, may be used for self-serving purposes. Hence, the court must scrutinize them carefully, together with the conduct of the person making them, and the external circumstances which might tend to confirm or refute them.

It is consequently necessary to determine the intent of Mr. Vanderstar in causing the Astral to enter American waters. It has been noted that "intention is almost always manifold and complex." Pollock, Jurisprudence 155 (1929). This requires an examination of Mr. Vanderstar's purpose or design. By any standard of proof, his testimony, together with that of Captain Perdue, has convinced the court that his intent was not to bring the Astral permanently into the United States. It is the finding of the court that his intention was to return the Astral to the Mediterranean, a fact that was indeed accomplished. See In re Dorrance's Estate, 309 Pa. 151, 163 A. 303 (1932) (intention required for the acquisition of a domicile of choice); In re Dorrance's Estate, 115 N.J.Eq. 268, 170 A. 601 (1934); Restatement of Conflict of Laws 2d, § 18 (1971). As a legal consequence of his intent not to bring the Astral permanently into the United States, the Astral was not, in customs law, an "importation" into the United States.

It is noteworthy that, in the *Prichard* case, the court resolved the question of intent on the basis of external circumstances. In that case, a yacht of Panamanian registry, purchased by Prichard, a United States resident, was brought into the United States, stopping first at Key West, Florida for fuel and then proceeding to Brownsville, Texas. The yacht was not allowed to clear from that

port to go on to New Orleans until the owner filed a consumption entry and deposited estimated duties. Five days after arriving at New Orleans, the yacht went on to Havana, Cuba. All the clearance papers indicated that no cargo was carried, and it was agreed that Prichard had no intention of documenting her under the laws of the United States or of selling or chartering her to a United States resident.

Noting that there was "no direct evidence as to his intentions with respect to the yacht, and such intentions must be determined on the basis of circumstances" (43 CCPA at 88), the court found that the events therein justified the conclusion that the yacht was presumptively imported into the United States within the meaning of the Tariff Act of 1930 when she arrived at the port of Brownsville. The court stated:

" * * * The record is silent as to the purpose for which the yacht was brought to that port, but since she was a pleasure ship and carried no cargo, the only reasonable presumption is that such purpose was a pleasure voyage, and the subsequent prompt departure of the yacht without cargo for New Orleans and Havana seems to strengthen that presumption.

"Prichard was a resident of the United States and there is no evidence that he ever changed such residence or intended to do so. It is logical to suppose, therefore, that, although the yacht might be taken abroad whenever he so desired, its use would be based in the home port in the United States. We consider that, at least *in the absence of clear evidence to the contrary,* a resident of the United States who buys a pleasure yacht abroad and brings it to this country *must be presumed to intend to use it in this country* to such an extent as to make it properly classifiable as an import. [Emphasis added.]" 43 CCPA at 88–89.

Thus, *Prichard* teaches that when a resident of the United States

brings into this country a yacht that he has purchased abroad, there is a presumption that he intends to use it here "permanently," that is, that it constitutes an importation, "in the absence of clear evidence to the contrary."

■ From the uncontroverted testimony in the present case the court finds that Mr. Vanderstar at no time intended to bring the Astral permanently into the United States. The court also finds that he brought the Astral to the United States only temporarily for repairs, and as part of a general shakedown cruise which was intended to, and did, in fact, end in the Mediterranean. The extended duration of the Astral's stay, from November 1970 to the end of June 1971, was unanticipated and was caused by the need for extensive repairs. Indeed, because of the warranties by domestic manufacturers of various fittings and parts, and the unavailability of factory representatives in earlier ports of call, such as Acapulco, it was to be expected that the repairs would be made in this country.

The fact that Mr. Vanderstar, his wife and friends may have occasionally used the yacht for their pleasure does not change the essential nature of the shakedown cruise.

Undoubtedly some of the work, such as the addition of a bunk and replacement of carpeting and upholstery, was in the nature of alterations and refurbishing. That, however, was minor compared to the time and effort expended making repairs on the hull, the diesel generators, the exhaust system, the air-conditioning compressor, the a. c. inverter, the toilets, the hot-water tank, the refrigerator and freezer system, and the rectangular portholes, among others, which were necessary to place the yacht into good operating condition.

It is also noted that the defendant has failed to offer any evidence in rebuttal. It has not been shown that these repairs were unnecessary, unduly prolonged, in the nature of only general maintenance, or that all or part of the Astral's stay in the continental United States or Hawaii was solely for pleasure cruising. It is also pertinent to note Mr. Vanderstar's testimony that he planned to move his interests to Europe where he had a considerable amount of business, and was also endeavoring to buy a house in the Mediterranean.

Nor has the defendant refuted plaintiff's claims that the Astral was intended to be used in the Mediterranean at the conclusion of her shakedown cruise; that certain features, such as the stern gangplank and shallow draft, were incorporated into her design for use in Mediterranean waters; that her shakedown cruise did terminate in the Mediterranean; and that, as of the time of trial, she was being readied for chartering in that area.

Additionally it may be noted that although the defendant now contends that the yacht was "imported," i. e., brought into the country "permanently," the district directors at San Diego and Honolulu apparently thought otherwise when they issued the cruising permits to the ship's master. If circumstances arose which warranted the Bureau's subsequent change of position, none has been stated, and the record is silent on this point.

In view of the foregoing, it is the determination of the court that the Astral was not brought permanently into the United States and hence was not "imported" within the meaning of general headnote 1 of the Tariff Schedules of the United States. Therefore, it was not subject to customs duty.

Judgment will issue accordingly.